**John C. FINE and Rick Trout, Plaintiffs,**

v.

**John M. ROCKWOOD, et al., Defendants.**

No. 92–10050–CIV.

United States District Court, S.D. Florida.

March 15, 1995.

John C. Fine, Boynton Beach, FL, pro se.

John D. Kallen, North Miami Beach, FL, for defendants.

### *MEMORANDUM OPINION*

JAMES LAWRENCE KING, District Judge.

Plaintiffs Fine and Trout brought this action in admiralty under 28 U.S.C. §§ 1332 and 1333 seeking a salvage award in the amount of $38,024.00 for their efforts in the February 21, 1992 incident with the M/V "Lion's Whelp."

## I. FINDINGS OF FACT

At approximately 3:10 pm on February 21, 1992, the M/V "Lion's Whelp" entered the channel of water leading to Ocean Reef Harbor in Monroe County, Florida. Between Greenmarker Nos. 17 and 19, the portside of the M/V "Lion's Whelp" struck a rock outcropping. The collision drove the portside stabilizer into the hull and the vessel started taking on water. Captain Richard Beck managed to maneuver the vessel through the channel to the Ocean Reef Club marina. There, the vessel was secured to the dock with lines just as the engines flooded. The vessel then began to settle towards the bottom of the channel. Both Captain Beck and Mate Sterling Davis entered the water to survey the damage. The local fire department arrived and deployed pumps into the hull.

Plaintiffs Fine and Trout were in the Dolphin Lagoon adjacent to the Ocean Reef Club dock at the time the incident occurred. Upon hearing bystander reports that the "Lion's Whelp" was sinking, Plaintiff Trout drove to the Ocean Reef Club with his dive equipment, tools and repair materials. He spoke to Captain Beck and offered to assist. Plaintiff Fine followed and also offered his assistance. Plaintiff Trout donned scuba equipment and entered the water to inspect the damage at approximately 4:00 pm. Plaintiff Fine began to take photographs of the scene from land and later donned scuba gear to continue taking photographs of the damaged hull underwater. From photographic slides taken at this time, it is clear that all compartments and machinery below decks were submerged completely. However, the water level did not rise over the decks.

The Ocean Reef Department of Public Safety arrived at the scene at approximately 3:30 pm. Ocean Reef personnel deployed an oil containment boom around the vessel. Plaintiffs Trout and Fine also began to patch the hull with plywood and stuffing material. A Florida Marine Patrol officer arrived on the scene at approximately 4:00 pm. He requested that Plaintiffs plug the thru-hull vents to prevent oil or fuel leakage and expressed concern about a potential fuel spill in the sensitive marine area of Ocean Reef. At approximately 4:30 pm, Captain Beck called Ocean Services Towing and Salvage, Inc. to request their services in raising and towing the vessel. The salvage crew arrived on the scene at approximately 6:30 pm. Ocean Services advised that the approximately 2,000 gallons of fuel on board the vessel should be removed before the vessel could be towed safely. An Ocean Services diver then began to reinforce the patch on the hull that Plaintiff Trout had applied. Plaintiff Fine assisted the salvage crew by closing hatches and doors inside the vessel in order to facilitate the dewatering process. Both Plaintiffs exited the water at approximately 7:20 pm and remained on the scene until approximately 10:00 pm, willing to be of further assistance if needed.

The pumps were deployed throughout the night. Danmark Environmental Services arrived at approximately 11:00 pm and off-loaded the fuel. The "Lion's Whelp" was dewatered successfully and on the morning of February 22, 1992, was taken under tow to Miami.

## II. CONCLUSIONS OF LAW

The law of salvage rewards the voluntary salvor for the successful rescue of life and property from maritime peril. See Mason v. The Blaireau, 6 U.S. (2 Cranch) 240, 266, 2 L.Ed. 266 (1804) (Marshall, C.J.). The salvage award, which is unique to maritime and admiralty law, is not one of *quantum meruit* as compensation for work performed. Rather, it is a bounty given on grounds of public policy to encourage the rescue of life and property imperiled at sea and to foster maritime commerce. See The Blackwall, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1869); 3A Martin J. Norris, Benedict on Admiralty, The Law of Salvage § 232 at 19–2 (1993). As long as the requirements for a salvage claim are met, a salvor's pecuniary motivations are irrelevant to his entitlement to a salvage award. See Flagship Marine Services, Inc. v. Belcher Towing Co., 761 F.Supp. 792, 795 (S.D.Fla.1991), *rev'd on other grounds*, 966 F.2d 602 (11th Cir.1992).

## A. Salvage Claim

■ To be entitled to a salvage award, the plaintiff has the burden of proving the following three elements of a salvage claim:

1) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance;

2) a voluntary act by the salvor under no pre-existing official or contractual duty to the owner; and

3) success in saving, or in helping to save at least part of the property at risk.

See *The Sabine*, 101 U.S. (11 Otto) 384, 25 L.Ed. 982 (1879); *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir.1985). To determine whether a maritime peril existed, the Court examines whether, at the time of the assistance was rendered, the ship was in a situation that might expose her to loss or destruction. *Markakis v. S/S Volendam*, 486 F.Supp. 1103, 1106 (S.D.N.Y.1980). However, the danger need not be immediate or actual. *Fort Myers Shell and Dredging Co. v. Barge NBC*, 404 F.2d 137, 139 (5th Cir. 1968). All that is necessary is a reasonable apprehension of peril. *Id.; B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir.1983); *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y.1881). If the vessel has the situation under control such that there is no "reasonable apprehension for her safety in the future if left to her own unaided efforts,"

then there is an absence of peril. *The J.C. Pfluger*, 109 F. 93, 95–96 (N.D.Cal.1901); *Neptune Maritime Co. of Monrovia v. Vessel Essi Camilla*, 562 F.Supp. 14, 25 (E.D.Va. 1982), aff'd 714 F.2d 132 (4th Cir.1983); *Clifford v. M/V Islander*, 751 F.2d 1, 6 (1st Cir.1984).

The existence of maritime peril is a necessary element for a valid salvage claim.[1] A vessel driven aground, on rocks, shoals or reefs is a classic example of a ship in maritime peril. 3A Norris, *Benedict on Admiralty, The Law of Salvage* § 64, at 5–4. Courts have found maritime peril where destruction appeared imminent or almost inevitable;[2] where the vessel is at the mercy of the sea and winds either as a result of collision[3] or lack of motive power;[4] where there is widespread fire aboard ship;[5] where explosions are likely;[6] where the vessel is leaking with the possibility of sinking;[7] where a vessel is stranded and being pounded by waves.[8] Other examples of peril include a listing fishing boat with a shifting cargo of herring;[9] a vessel moored to a buoy that was blown adrift;[10] vessels in tow that have broken loose during storms;[11] a ship drifting near shoal water flying distress signals;[12] an ancient abandoned shipwreck.[13]

■ Using the foregoing as a guide, the Court first examines whether there existed a maritime peril to the M/V "Lion's Whelp" in the instant case. The weather was clear and the seas were calm. Captain Beck testified

---

1. Plaintiffs argued at trial that their efforts saved property aboard the "Lion's Whelp." Without deciding the merits of this contention, the Court notes that preventing damage to a vessel's equipment is not dispositive in determining whether a maritime peril threatened the *vessel*. The Court further notes that by the time Plaintiffs arrived on the scene, the engines of the "Lion's Whelp" were already damaged since all compartments and machinery below decks were submerged entirely.

2. *The Craster Hall*, 213 F. 436 (5th Cir.1914).

3. *The Hyderabad*, 11 F. 749 (E.D.Wis.1882).

4. *Texas Co. v. Texas & Gulf S.S. Co.*, 263 F. 868 (5th Cir.1920).

5. *The Delmira*, 283 F. 441 (S.D.Fla.1922).

6. *The George W. Elzey*, 250 F. 602 (2d Cir.1918).

7. *The Fern*, 258 F. 716 (S.D.Ala.1919), aff'd, 268 F. 518 (5th Cir.1920).

8. *The Alamo*, 75 F. 602 (5th Cir.1896).

9. *Haugen v. The Cape Karluk*, 107 F.Supp. 34 (W.D.Wash.1952).

10. *The Sir Robert Fernie*, 96 F. 348 (W.D.Wash. 1899).

11. *Puget Sound Tug & Barge Co. v. Waterman S.S. Corp.*, 98 F.Supp. 123 (N.D.Cal.1951), aff'd, 199 F.2d 600 (9th Cir.1952), cert. denied, 345 U.S. 941, 73 S.Ct. 832, 97 L.Ed. 1367 (1953).

12. *The Flottbek*, 118 F. 954 (9th Cir.1902).

13. *Treasure Salvors v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 556 F.Supp. 1319 (S.D.Fla.1983).

that he maneuvered the "Lion's Whelp" to the Ocean Reef Club and secured the vessel with lines to the dock. Testimony elicited at trial was uncontroverted that at the time Plaintiffs Trout and Fine arrived at the scene and entered the water, the M/V "Lion's Whelp" was tied to the dock and was settling onto the channel bottom. Although there was a hole in the hull, the circumstances were not such that exposed the "Lion's Whelp" to loss or destruction, *Markakis v. S/S Volendam,* 486 F.Supp. 1103 (S.D.N.Y. 1980) or caused a reasonable apprehension for her future safety. *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333 (2d Cir. 1983).

After considering the testimony of the witnesses and viewing photographic slides taken at the time of the incident, the Court finds that having been secured to the dock and settling towards the channel bottom, the "Lion's Whelp" was not in a situation of maritime peril from which she could not have been rescued without Plaintiffs' help.

However, Plaintiffs contend that the threat of leakage of the approximately 2,000 gallons of fuel on board the "Lion's Whelp" was an environmental danger sufficient to constitute marine peril for purposes of a salvage award. In essence, Plaintiffs seek a salvage award for averted liability insofar that their services prevented Defendants from incurring civil penalties for environmental damage.

■ The Court declines to adopt averted liability as a new, independent basis for salvage compensation. The categories of salvage service do not lend themselves to including averting an environmental disaster as salvage, although the form which salvage service takes is not the single or paramount consideration. Nonetheless, after careful consideration, the Court finds that a clear distinction exists between salvage services and the prevention of marine environmental damage. Salvage service includes towage, stranding, fire fighting, recovery of cargo, life salvage, supplying men and stores, standing by or securing aid, giving advice, pilotage, preventing collision, recapture from enemies, pirates and privateers; and raising sunken craft and property. *See* 3A Norris, *Benedict on Admiralty* §§ 16–31. In each example, the salvor has taken voluntary, affirmative action to aid, rescue or preserve the *vessel,* her crew, or cargo from a maritime peril.

■ In contrast, there is no danger from which the vessel, her crew and cargo must be saved where the peril is a potential hazard to the marine environment alone.[14] The essence of salvage law is to reward the voluntary salvor for rescue of life or property imperiled at sea. *See id.* at §§ 1–6. It may be appropriate to consider averted liability in calculating the amount of a salvage award where the prerequisites for a salvage claim have been satisfied already, but averting environmental pollution by itself is an insufficient basis for a salvage claim. *See Trico Marine Operators, Inc. v. Dow Chemical Co.,* 809 F.Supp. 440, 443–44 (E.D.La.1992). Furthermore, the record in this case does not show that environmental damage in fact occurred or that it would have occurred but for Plaintiffs' successful salvage efforts.[15]

The Court thus finds that Plaintiffs have failed to establish the first element of maritime peril to the "Lion's Whelp" for a valid salvage claim. It is therefore unnecessary to address the other two elements.

### B. Compensation

■ The Court finds that although Plaintiffs have not established a claim for salvage,

---

14. The Court recognizes that fuel spills are a peril or danger to the environment. However, as a legal term of art defined by the Supreme Court in the context of salvage claims, "maritime peril" does not contemplate the former, broader understanding of the term. *See The Sabine,* 101 U.S. (11 Otto) 384, 25 L.Ed. 982 (1879).

15. The Ocean Reef Department of Public Safety arrived on the scene at 3:30 p.m., very shortly after the "Lion's Whelp" arrived at the Ocean Reef Club dock. Public Safety immediately deployed the oil containment boom.

Officer Collins of the Florida Marine Patrol testified that he was concerned about a potential fuel or pollutant spill. However, he further testified that when he left the scene around 8:00— 9:00 p.m., he was satisfied that there was no oil spill. In his accident investigation report he states that he "could not detect any fuel leakage." Plaint.Exh. 3 at 3.

they did render aid and assistance to the "Lion's Whelp" and her crew. Under the theory of *quantum meruit* and for policy reasons to encourage the assistance of vessels in distress, the Court finds that Plaintiffs are entitled to compensation for their services. Testimony at trial established that the rate of compensation for an experienced scuba diver is $125.00 per hour. This is the rate Ocean Services Towing and Salvage Co. charged for the work their divers performed on the "Lion's Whelp."

The Court finds that Plaintiffs provided services for six (6) hours each. Each plaintiff is an experienced diver and the Court finds that they should be compensated at the hourly rate standard in the industry. Accordingly, the Court finds that Plaintiffs are entitled to $750.00 each.

### C.  Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have failed to establish a valid salvage claim. However, Plaintiffs are entitled to $750.00 each under the theory of *quantum meruit.*

It is

ORDERED, ADJUDGED and DE-CREED as follows:

1.  Defendant John M. Rockwood be, and he is hereby, ORDERED to pay Plaintiff Fine and Plaintiff Trout $750.00 dollars each.

2.  Final judgment will be entered by separate order.

DONE and ORDERED in chambers at the United States District Courthouse, Federal Justice Building, Miami, Florida, this 15th day of March, 1995.