**UNITED STATES of America, et al.,**

v.

**EX–USS CABOT/DEDALO, its engines, tackle, apparel, appurtenances, etc., in rem.**

**Civ.A. No. B–99–072.**

United States District Court,
S.D. Texas,
Brownsville Division.

Sept. 14, 2000.

Peter Glenn Myer, U.S. Dept. of Justice, Civil Division, Washington, D.C., Nancy Lynn Masso, Office of U.S. Attorney, Brownsville, TX, for U.S.

James F. Buchanan, Office of U.S. Attorney, Corpus Christi, TX, for Educational Council for Space Age Technology.

Brian Gary Janis, Sanchez Whittington, Brownsville TX, for Port Isabel San Benito Navigation District.

James H. Hunter, Jr., Royston, Rayzor, Vickery and Williams, Brownsville, TX, for Kanti Bhakta, Arun Bhakta, Vinod Bhakta, Mukeshbhai Patel and Jay Rama.

Joseph P. Tynan, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Board of Commissioners of the Port of New Orleans.

Dennis M. Sanchez, Sanchez Whittington, T. Mark Blakemore, Rentfro Faulk, Brownsville, TX, for Ex–USS Cabot/Dedalo, its Engines, Tackle, Apparel, Appurtenances, etc., in rem., Bedoli Group, Inc., Global Maritime Group, LLC, and Marine Salvage & Services Inc.

**FINAL JUDGMENT DISTRIBUTING THE PROCEEDS OF THE COURT–ORDERED SALE OF THE EX–USS CABOT/DEDALO**

TAGLE, District Judge.

BE IT REMEMBERED, that on September 13, 2000, the Court held that Ma-

rine Salvage & Services, Inc. has a salvage lien for $20,908.00 and the United States of America has a salvage lien for $70,342.68. Both Marine Salvage & Services, Inc. and the United States of America are also entitled to a pro rata share of the interest accrued on their liens while the funds were deposited in the Court Registry. There are insufficient funds in the Court Registry to satisfy any of the other maritime liens asserted in this case.

## I. *Summary of the procedural history and facts of the lawsuits filed against the Ex–USS Cabot/Dedalo*

The Ex–USS Cabot/Dedalo ("the Cabot") is a decommissioned navy aircraft carrier that has had a long history in Louisiana and Texas' federal courts. To this Court's knowledge, the Cabot has been the subject of *in rem* lawsuits on four different occasions.[1] The Board of Commissioners of the Port of New Orleans first filed suit against the vessel on March 21, 1994 in the United States District Court for the Eastern District of Louisiana. After the Cabot was moved to Port Isabel and then to Brownsville, Texas, this Court arrested and released the Cabot twice before finally seizing the vessel in the present case and ordering a judicial sale.

The Cabot was owned by the U.S.S. Cabot Dedalo Museum Foundation, Inc. and docked at the Press Street Wharf in the Port of New Orleans from about February 4, 1993 to October 13, 1997. On May 3, 1997, the M/V Tomis Future collided with the Cabot and damaged both the vessel and the Press Street Wharf. The owner of the M/V Tomis Future hired Crescent Towing to position a tugboat alongside the Cabot from May 3rd to May 7th. The tugboat was necessary to prevent the Cabot from breaking away from the wharf. When the owner of the M/V Tomis Future took Crescent Towing off hire on May 7th, the U.S.S. Cabot Dedalo Museum Foundation, Inc. refused to take action to protect its ship. The United States Coast Guard was therefore forced to take over. The Coast Guard performed repairs to the wharf and hired companies to provide tug assistance to protect the Cabot from breaking away and colliding with another vessel or facility. On October 12, 1997, the Coast Guard paid for the Cabot to be taken to a safer docking facility in Violet, Louisiana. The Coast Guard spent at least $500,868.94 on wharf repairs, tug assistance, and towing the Cabot.[2]

The Parties in this case disagree on whether the Cabot was in real danger of breaking away from her moorings after the allision, and whether the Coast Guard's actions in protecting the vessel were reasonable. Daniel Whiting, the On Scene Coordinator's Technical Representative

---

**1.** If there were a repeat offender statute for vessels, the Cabot would surely fit the bill.

**2.** The United States claims that it is entitled to $604,515.94 for salving the Cabot. It submitted receipts that indicate that it paid the following companies for services rendered to the Cabot: (1) Crescent Towing was paid $49,473.00 for tug assistance from May 7 to 12, 1997; (2) Bisso Marine was paid $426,078.64 for tug assistance from May 12 to July 25, 1997; and, (3) Summit Design was paid $25,317.30 for a survey and development of a dead ship tow plan in May of 1997. The United States also submitted receipts that in-

dicate that it paid the Violet Dock Port, Inc. $103,647.00 for wharfage and services. At the bench trial, the United States did not explain why Violet Dock Port, Inc. was paid $76,140.00 for berthing the Cabot for 81 days, when the Cabot was moved to Port Isabel, Texas shortly after it arrived in Violet, Louisiana. However, the Court need not address this issue because the amount claimed by the United States, discounting the moneys paid to Violet Dock Port, Inc. for berthing the Cabot, is $500,868.94, an amount that far exceeds the sale proceeds available for distribution.

under the Coast Guard's National Contingency Plan, personally observed the vessel and its moorings both before and within 24 hours after the accident. He stated that the allision caused a 99 to 100 percent failure of the ship's moorings, that the Cabot was in imminent danger of breaking free on a fast-running river, and that tug assistance was essential to keep the Cabot in place. At the Court's bench trial, Johnny Cefalu, the Board of Commissioners' Marine Terminal Superintendent, challenged Mr. Whiting's conclusions, and William E. Kennon, Jr. of Marine Salvage, stated that he believed it was unreasonable to have held the Cabot in place with tugs instead of completing additional repairs to the wharf. However, on cross-examination both witnesses admitted that they either did not have the technical expertise to judge the Coast Guard's decisions or did not know whether the Coast Guard could have reasonably taken an alternative course of action.

The Cabot departed Violet, Louisiana for Port Isabel, Texas on or about October 13, 1997. The new owner of the vessel, Pankaj I. Patel, contacted William E. Kennon, the President of Marine Salvage, to help him arrange for the Cabot's wharfage upon arrival in Port Isabel.[3] Mr. Patel told Mr. Kennon that he wanted to dock the Cabot at Port Isabel for two to three months until a berth was readied in Brownsville, Texas where the vessel was to be scrapped. Mr. Patel maintained little contact with Mr. Kennon after the Cabot arrived in Port Isabel, ostensibly because he owed Mr. Kennon money. During the beginning of March 1998, Mr. Kennon noticed that the Cabot began to list and unsuccessfully tried to contact Mr. Patel. When the list increased markedly over a matter of days, Mr. Kennon feared that the vessel would capsize if the condition was not corrected. He stated at trial that if the Cabot had fallen over it "[p]retty much [would have] destroyed the value [of the vessel] in the sense ... [that] it would have cost a fortune to try and raise that ship up. The economics of it would have been horrendous and there's no telling who would've been able to come up with the money to try and raise it."[4] Mr. Kennon successfully acted to stabilize the ship from March 14 to March 21, 1998, and submitted a bill that indicates that he spent $20,908.00 on the endeavor.[5] In addition, Marine Salvage has submitted bills that support a claim for necessaries for $56,872.39.

At trial, the United States attempted to show that Mr. Kennon acted pursuant to an oral agreement with Mr. Patel in correcting the list and that the Cabot was

3. It appears that ownership of the Cabot was transferred from the U.S.S. Cabot Dedalo Museum Foundation, Inc. to Mr. Patel at some point before the vessel was transported to Port Isabel, Texas. However, the record does not indicate the details of this transaction.

4. Unedited trial transcript, p. 42, lines 5–9.

5. At different times and in different documents Marine Salvage has varied the amount it claims for salving the Cabot. In its complaint, Marine Salvage states that it has a salvage lien based on its activities from February 14 to April 4, 1998, in an amount to be determined by the Court [Dkt. No. 21]. In the Parties' Joint Pretrial Order, Marine Salvage claimed it has a salvage claim for $77,780.39 [Dkt. No. 86, p. 2]. During closing arguments, counsel for Marine Salvage argued that it is entitled to $24,700.00 [Unedited trial transcript, p. 101, line 24]. Mr. Kennon, however, testified at trial that he provided salvage services to the Cabot from March 14 to March 21, 1998, and the bill submitted by Marine Salvage for those dates totals $20,908.00 [Unedited trial transcript, p. 40, lines 13–18; Marine Salvage, Trial Exhibit No. 23, p. 6–8]. The evidence at trial therefore only supports a salvage claim for $20,908.00, and all other allegations are of no import.

never in danger of capsizing. The evidence shows, however, that Mr. Kennon's actions were beyond the scope of his oral agreement with Mr. Patel, which was limited to arranging for the initial mooring of the vessel. The United States' witness, Mr. Barry Chambers, testified that while a significant list does not necessarily mean that an aircraft carrier will fall over, it all depends on why the vessel is listing and how the vessel is moored. When Mr. Kennon acted it was initially unknown why the vessel was increasingly leaning over to one side and since the vessel was not in a slip, the list could not be stopped by the vessel leaning against the bank. In addition, Mr. Kennon's actions are supported by the concerns expressed by the Marine Safety Office of Port Isabel.

On June 19, 1998, while the Cabot was docked in Port Isabel, Marine Salvage, among others, filed suit against the vessel *in rem*, and this Court issued an arrest warrant on that same day.[6] On June 22, 1998, the Court granted the parties' joint motion to move the Cabot to the Port of Brownsville. After the vessel was moved to Brownsville, the Court granted a motion to release the Cabot and dismiss the lawsuit without prejudice on September 16, 1998. Before the Cabot was released from

*custodia legis,* Marine Salvage entered into a settlement agreement with the owner of the vessel through which it was to receive a portion of the proceeds from scrapping the vessel.

On September 15, 1998,—a day before this Court non-suited its first arrest of the Cabot—United States District Judge Eldon E. Fallon of the Eastern District of Louisiana entered judgment *in personam* against the U.S.S. Cabot Dedalo Museum Foundation, Inc. and *in rem* against the Cabot.[7] Subsequently, on September 6, 2000, Judge Fallon entered an order amending his prior judgment. The corrected judgment was entered solely *in personam* against the U.S.S. Cabot Dedalo Museum Foundation, and not *in rem* against the vessel.

This Court issued a summons to arrest the Cabot on a second occasion on September 29, 1998 based on a verified complaint filed by the United States.[8] The Court dismissed the lawsuit without prejudice based on the United States' Notice of Voluntary Dismissal before it held a hearing or made any substantive rulings. The order dismissing the lawsuit was entered on February 25, 1999.

The Court finally arrested the Cabot in the present case on April 27, 1999 [Dkt.

---

6. The case was styled: Gateway Tugs, Inc. (plaintiff), Marine Salvage & Services, Inc. (plaintiff), The Global Maritime Group (plaintiff) and the United States of America (intervenor-plaintiff) vs. the M/V Cabot, *in rem* (Civil Action Number B–98–89). The Court takes judicial notice of the official record of this case.

7. The case was filed in March of 1994 and was styled: The Board of Commissioners of the Port of New Orleans vs. the U.S.S. Cabot Dedalo, *in rem*, and the U.S.S. Cabot Dedalo Museum Foundation, Inc., *in personam* (Civil Action Number 94–932, Section J(4)). Judge Fallon rendered an oral judgment and findings of fact on September 15, 1998, and entered a written judgment on the following

day. Judge Fallon awarded the Board of Commissioners of the Port of New Orleans $399,685.48 for past due dockage charges, 5.27 percent interest calculated from April 11, 1994 until payment, and court costs. The Court takes judicial notice of the orders and pleadings submitted by the Board of Commissioners and the docket sheet, minutes, and orders obtained from the Clerk's Office for the Eastern District of Louisiana and Judge Fallon's Chambers.

8. The case was styled: United States of America vs. Ex–USS Cabot/Dedalo, its engines, tackle, apparel, appurtenances, etc., *in rem* (Civil Action Number B–98–137). The Court takes judicial notice of the official record of this case.

No. 5], and the vessel was sold at an auction on September 9, 1999. After the sale, the Court held a two-phase bench trial to determine the distribution of the $185,000.00 in sale proceeds. The first phase of the trial was held to determine the *custodia legis* expenses of the substitute custodian, and the second phase—the subject of this order—was held to determine the priority and amount of the maritime liens asserted by the Parties to this lawsuit.

The first phase of the trial was held on April 19, 2000. On May 12, 2000, the Court ruled that the substitute custodian was entitled to $90,047.06 [Dkt. No. 90]. The expenses incurred by the Marshals Service, in the amount of $3,702.26, have also been deducted from the sale proceeds pursuant to 46 U.S.C. § 31326. Therefore, $91,250.68, and the interest accrued on that amount, remains to be distributed through the Court's rulings based on the second phase of the trial.

The second phase of the trial was held on June 12, 2000 to obtain evidence on the priority and amount of the maritime liens asserted by Marine Salvage & Services, Inc. ("Marine Salvage"), the United States of America ("United States"), and the Board of Commissioners of the Port of New Orleans ("Board of Commissioners"). Marine Salvage claims that it has a salvage lien based on voluntary services rendered to prevent the Cabot from capsizing in Port Isabel, Texas, and an additional lien based on necessaries provided to the vessel. The United States alleges that it has a salvage lien because it prevented the Cabot from breaking loose after another vessel collided with it in New Orleans. Finally, the Board of Commissioners

claims that it has a priority lien based on the initial *in rem* judgment it obtained in Louisiana federal district court. This order contains the Court's rulings on the distribution of the remaining sale proceeds in satisfaction of the aforementioned maritime liens.

## II *Marine Salvage and the United States have both asserted valid pure salvage liens*

### A. *The Court has jurisdiction over Marine Salvage and the United States' claims*

The Board of Commissioners of the Port of New Orleans asserts that the United States and Marine Salvage do not have valid salvage claims and that this Court does not have jurisdiction over their claims because the Cabot was a dead ship when their causes of action accrued. A ship is "dead" when it has been definitively removed from navigation.[9] An individual generally cannot assert a maritime lien against a dead ship under federal admiralty jurisdiction. *See* Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 3–6 (2d ed.1994). This makes sense given that the modern justification for admiralty jurisdiction is "the important national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation," and a ship that is removed from navigation does not trigger that interest. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 677, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). However, it is black letter law that services voluntarily rendered to protect a dead ship from peril do give rise to a salvage claim under federal admiralty jur-

9. *See Robert E. Blake Inc. v. Excel Envtl.*, 104 F.3d 1158, 1160–63 (9th Cir.1997); *Murray v. Schwartz*, 175 F.2d 72, 72–73 (2d Cir.1949); *The Poznan*, 9 F.2d 838, 843 (2d Cir.1925); *Frank B. Hall & Co., Inc. v. S/S Seafreeze Atlantic*, 423 F.Supp. 1205, 1208 (S.D.N.Y. 1976).

isdiction.[10] The Board of Commissioners' assertion that this Court does not have jurisdiction over the United States and Marine Salvage's salvage claims is therefore incorrect.

B. *Marine Salvage has asserted a pure salvage lien, Independent of its contract for necessaries with the owner of the vessel*

■ The United States contends that Marine Salvage acted under a negotiated contract for necessaries that was not contingent on success, and, therefore, its claim is not entitled to priority as a salvage lien. *See Atco, Inc. v. Disch Const.,* 1992 WL 230482, *7 (S.D.N.Y.1992) (citing *Munson Inland Water Lines v. Seidl,* 71 F.2d 791, 794 (7th Cir.1934)); 3A BENEDICT ON ADMIRALTY § 144 (7th ed.1997). Marine Salvage, on the other hand, asserts that it has a pure salvage lien that does not depend on its oral contract with the owner of the Cabot, Mr. Pankaj I. Patel. A pure non-contract salvage lien can arise despite the existence of a maritime contract, if the entity claiming the salvage lien voluntarily performed services over and above those required by the contract because the vessel was in peril. *See Atco, Inc.,* 1992 WL 230482, *6; 3A BENEDICT ON ADMIRALTY § 144 (7th ed.1997). The oral agreement between Mr. Patel and Marine Salvage, required Mr. Kennon, Marine Salvage's President, to facilitate the Cabot's arrival and anchoring at Port Isabel. Mr. Kennon stated at trial that he "completed [his] duties whenever [he] got through tying up the ship."[11] Afterwards, Mr. Kennon did

work on the vessel "only on special request" of Mr. Patel.[12] Mr. Kennon tried unsuccessfully to contact Mr. Patel in Virginia to obtain authority before righting the Cabot's list. After Mr. Kennon began to correct the list, Mr. Patel appeared once and "just kind of agreed with everything that something had to be done and he left."[13] Mr. Patel did not contact Mr. Kennon again until after the list was already corrected. Based on Mr. Kennon's uncontroverted testimony, the Court finds that Marine Salvage's actions were voluntary and it did not act pursuant to an oral contract with Mr. Patel.

C. *Marine Salvage did not waive its salvage claim by non-suiting a prior lawsuit and entering into a settlement agreement with the owner of the Cabot*

1. *The Court can properly consider the affirmative defense of waiver although it was raised for the first time at trial*

■ At trial, the Board of Commissioners and the United States argued for the first time that Marine Salvage waived its maritime liens by entering into a settlement agreement with the Cabot's owner. The issue surfaced during the Board of Commissioner's cross-examination of Mr. Kennon, Marine Salvage's President. It seems that the Board of Commissioners was unaware that Marine Salvage had previously arrested the Cabot.[14] The United States, on the other hand, must have known that Marine Salvage asked this Court to arrest and release the Cabot because it intervened in that lawsuit. At trial, the Court re-opened the record after

---

**10.** *See The Elfrida,* 172 U.S. 186, 204–05, 19 S.Ct. 146, 43 L.Ed. 413 (1898); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 337 (5th Cir.1978); George Rutherglen, *Dead Ships,* 30 J. MAR. L. & COM. 677, 682 (1999).

**11.** Unedited trial transcript, p. 55, lines 21–22.

**12.** Unedited trial transcript, p. 56, line 9.

**13.** Unedited trial transcript, p. 38, lines 5–7.

**14.** Marine Salvage submitted evidence indicating that the Board of Commissioners may have been aware of the prior arrest before trial [Dkt. No. 106].

closing arguments to clarify the circumstances underlying the prior arrest and release of the Cabot. In addition, the Court ordered the Parties to submit post-trial briefs on the issue [Dkt. Nos. 106, 108, 109, 117].

■ Normally, waiver is an affirmative defense that must be specially pled pursuant to Federal Rule of Civil Procedure 8. *See Pan American Bank of Miami v. The Oil Screw Denise*, 613 F.2d 599, 602 (5th Cir.1980). However, an affirmative defense can be raised for the first time at trial if it is not unfair to the opposing party. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 271 (5th Cir.1999); *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 856 (5th Cir.1983). Given that the Court allowed the Parties to re-open the record to fully explore the evidence and that the Parties submitted post-trial briefs on the issue, the Court finds that it is not unfair to consider whether Marine Salvage waived its liens by entering into a settlement agreement.

2. *Marine Salvage did not waive its salvage lien by entering into a settlement agreement in a prior lawsuit* [15]

■ In September 1998, this Court granted Marine Salvage's motion to dismiss its *in rem* claims against the Cabot for salvage and necessaries without prejudice.[16] Marine Salvage revealed in the present proceeding, in which it has also asserted a lien for necessaries and for salvage, that it moved to dismiss the earlier arrest of the Cabot because it was required to do so under a settlement agreement. The settlement agreement stated that "[t]he parties shall, concurrent with the execution of this Settlement Agreement, execute a Joint Motion to Dismiss, without prejudice to Marine Salvage to subsequently file a similar claim" [Dkt. No. 106, Exhibit A, ¶ 1]. The substance of the settlement agreement provided that once the Cabot was released from *custodia legis*, Marine Salvage would receive a percentage of the proceeds from scrapping the vessel. The Board of Commissioners and the United States have argued that this settlement agreement operated to waive Marine Salvage's salvage lien, and, therefore, Marine Salvage cannot reassert the lien in the current proceeding.

■ Maritime liens can be waived expressly or by implication based on a lienholder's actions.[17] However, "waiver is not favored, and the courts will require a

**15.** Although the United States and the Board of Commissioners have argued that Marine Salvage has waived both its lien for salvage and necessaries, the Court will only address waiver of Marine Salvage's salvage claim in this order. The United States has asserted a valid salvage claim, *see infra* Section II(D) of this order, and there are insufficient funds in the Court Registry to satisfy any liens for necessaries.

Several of the cases cited in this section of the Court's order concern the waiver of maritime liens through actions taken before suit was filed or solely address liens for necessaries; however, their reasoning and holdings apply equally to this case. This is supported by the fact that all three Parties relied on cases that solely address liens for necessaries in their post-trial briefs.

**16.** *See* Section I *supra* for additional details on the prior lawsuit filed by Marine Salvage in June of 1998.

**17.** While salvage claims are common law instead of statutory creatures, the United States Code does affect their priority. Salvage claims are included in the definition of "preferred maritime liens" that have priority over preferred mortgage liens. *See* 46 U.S.C. §§ 31301, 31326. The United States Code explicitly states that its chapter on maritime liens "does not prevent a mortgagee or other lien holder from waiving or subordinating at any time by agreement or otherwise the lien

clearly manifested intention to forego the lien. The intention of the lienholder to waive the lien will be the determining factor, and the courts will be reluctant to find waiver where the right of recovery of the lienholder is prejudiced." Thomas Schoenbaum, ADMIRALTY AND MARITIME LAW § 9–7 (2nd ed.1994).[18] The parties attacking a maritime lien bear a heavy burden of proof.[19]

 Both the United States and the Board of Commissioners argue that Marine Salvage's settlement agreement is tantamount to the release of a vessel from *custodia legis* upon a stipulation, the posting of a bond, or the provision of some other type of security.[20] It is well-settled that "[i]n the absence of fraud or misrepresentation, the release of a vessel upon the posting of security discharges the lien against the vessel." *Alyeska Pipeline Ser-vice Co. v. Vessel Bay Ridge*, 703 F.2d 381, 384 (9th Cir.1983) (citing *United States v. Ames*, 99 U.S. 35, 36, 25 L.Ed. 295 (1878); *Southern Oregon Production v. Oil Screw SWEET PEA*, 435 F.Supp. 454, 459 (D.Or. 1977)).[21] All of the many cases that hold that posting security extinguishes a maritime lien concern unconditional promises. *See* Thomas Schoenbaum, ADMIRALTY AND MARITIME LAW § 21–5 (2nd ed.1994). In those cases, the object, contract, or money is simply substituted for the *res*. *See Continental Grain Co.*, 268 F.2d at 243–44.

Marine Salvage's settlement agreement is not analogous to the release of a vessel under bond because the settlement was not an unconditional agreement to depend on the contract in lieu of a maritime lien.[22] The settlement agreement states that the pending lawsuit was to be dismissed without prejudice to file a subsequent *in rem*

holder's right to a lien, the priority or, if a preferred mortgage lien, the preferred status of the lien." 46 U.S.C. § 31305.

18. *See Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1209 (5th Cir.1978). *See also* 2 BENEDICT ON ADMIRALTY § 61 (7th ed.1999).

19. *See e.g. Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743 (5th Cir.1985); *TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1139 (5th Cir.1983); *Newport News Shipbuilding and Dry Dock Co. v. S.S. Independence*, 872 F.Supp. 262 (E.D.Va. 1994).

20. Supplemental Rule E(5) of the Supplemental Rules for Certain Admiralty and Maritime Claims, Federal Rules of Civil Procedure, provides the procedure for obtaining the release of a vessel in *custodia legis* through posting some type of security or through a stipulation.

21. *See also Industria Nacional Del Papel, CA. v. M/V Albert F.*, 730 F.2d 622, 625 (11th Cir.1984); *Continental Grain Co. v. Federal Barge Lines, Inc.*, 268 F.2d 240, 244 (5th Cir.1959).

22. The Board of Commissioners also argues that Marine Salvage's settlement agreement is equivalent to a letter of undertaking, and, therefore, constitutes a waiver of its salvage claim. The Board of Commissioners cites *Continental Grain Co. v. Federal Barge Lines, Inc.* to support its argument. *See* 268 F.2d 240. In *Continental Grain Co.*, the Fifth Circuit treated the issuance of a letter of undertaking as the equivalent of a seizure in rem and release upon bond. *Id.* at 243. Therefore, issuance of a letter of undertaking extinguishes a maritime lien just like the release of a vessel upon the posting of security. This argument does not merit separate consideration because it is identical to the contention that the settlement agreement constituted the posting of a security or bond.

In addition, the Board of Commissioners contends that Marine Salvage waived its lien through the settlement agreement because the agreement did not include "lien preserving provisions" as in *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743 (5th Cir.1985). *Gulf Oil Trading Co.* is inapplicable to the facts of this case. In *Gulf Oil Trading Co.*, the Fifth Circuit simply held that actual knowledge of a prohibition of lien clause defeats the statutory presumption that no such clause exists. *Id.* at 746–47.

proceeding against the Cabot. The fact that the agreement explicitly states that the lawsuit was to be dismissed without prejudice indicates that while Marine Salvage preferred to obtain payment out of court, it did not intend to waive its right to reassert a salvage lien if it did not obtain satisfaction under the settlement agreement or if the Cabot were re-arrested. Mr. Kennon, Marine Salvage's President, stated as much at trial when he said that he entered into the settlement agreement because *in rem* proceedings against a vessel are expensive and cumbersome, and he believed that he was more likely to receive payment if the vessel was not in *custodia legis*.[23]

In addition, the agreement specifically discusses what would happen if the Cabot were re-arrested [Dkt. No. 106, p. 3, ¶ 5]. This indicates that Marine Salvage was aware that the Cabot had numerous outstanding debts—Gateway Tugs, Inc. and the United States asserted maritime liens in the lawsuit initiated by Marine Salvage, and that it was likely that the vessel would be re-arrested before the settlement agreement was fully carried out. In fact, the Cabot was re-arrested by the United States within approximately two weeks of the order dismissing Marine Salvage's lawsuit. Under the circumstances, it would not make sense for Marine Salvage to rely on the settlement agreement and waive its lien.

While the settlement agreement did not act as an absolute waiver of Marine Salvage's lien, it did operate as a conditional waiver. *See e.g. Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883–84 (5th Cir.1974); *In re SeaEscape Cruises, Ltd.*, 172 B.R. 1002, 1007 (S.D.Fla.1994).[24] If the Cabot had been scrapped and there was no breach of the settlement agreement, Marine Salvage most probably could not have filed suit to reassert its lien. However, the settlement agreement was breached. The Cabot was not scrapped as planned and Marine Salvage did not obtain payment. Instead, the vessel was re-arrested when the United States filed suit against the vessel in the present proceeding.

The United States' response to Marine Salvage's post-trial brief does not address the argument it made at trial [Dkt. No. 109]. At trial, the United States argued that Marine Salvage waived its claim by entering into a settlement agreement. In its post-trial response brief, however, the United States makes a second and independent waiver argument. It argues that the Court should treat Marine Salvage's cause of action as a maritime lien for necessaries instead of a pure salvage claim because Marine Salvage's post-trial brief cites to cases on necessaries and classifies its own claim, as asserted in the earlier lawsuit, as a lien for necessaries. This argument mischaracterizes Marine Salvage's post-trial brief and does not present a plausible waiver argument.

It is clear that Marine Salvage has asserted a lien for necessaries and, in the alternative, for salvage in both the prior and the present lawsuit,[25] and there is no

---

**23.** Unedited trial transcript, p. 102, line 22—p. 103, line 22.

**24.** Both *Veverica* and *In re SeaEscape Cruises, Ltd.* concern contracts that were entered into before the vessel was arrested; however, the logic and reasoning of the cases apply equally to the fact scenario at hand.

**25.** Civil Case Number B–99–89, Dkt. No. 1, p. 4; Civil Case Number B–99–72, Dkt. No. 21, p. 3; Unedited trial transcript, p. 101, line 7—p. 102, line 10. Marine Salvage has explicitly stated that it has a salvage lien in virtually every document it has submitted to the Court. Its post-trial brief is the first document that refers to its maritime lien without using the word salvage.

indication that Marine Salvage intended to waive its lien through its post-trial brief. To the contrary, Marine Salvage submitted the brief to argue that it had *not* waived its liens. A common sense reading of the post-trial brief indicates that when Marine Salvage states that it "initiated an *in rem* seizure action in ... 1998 to enforce its maritime lien for necessaries," it is referring to only a portion of the cause of action it asserted in the prior lawsuit or it made an inadvertent mistake [Dkt. No. 106, p. 2]. In addition, while the United States correctly states that Marine Salvage's argument in its post-trial brief is based mostly on statutory provisions and case law on liens for necessaries, it is clear that Marine Salvage is trying to argue by analogy that it is extremely difficult to waive any maritime lien. While Marine Salvage misstates the law by arguing that both its liens arise from the provisions of the United States Code, that hardly indicates that Marine Salvage intended to waive a cause of action that it has consistently asserted over several years and in two separate lawsuits.

In conclusion, the United States and the Board of Commissioners have not carried the heavy burden required to demonstrate that Marine Salvage intended to waive its salvage lien. From the testimony at trial, the Parties' post-trial briefs, and the text of the settlement agreement, it is clear that Marine Salvage did not intend waive its right to assert a salvage lien against

the Cabot by entering into the agreement or through the text of its post-trial brief.

### D. Marine Salvage and the United States have satisfied the requirements to establish a pure salvage lien

To assert a salvage lien an individual must have voluntarily rendered assistance to a vessel in peril and succeeded in abating that peril in whole or in part. A vessel is in peril when it is "exposed to any actual or apprehended danger which might result in her destruction." *Evanow v. M/V Neptune*, 163 F.3d 1108, 1114 (9th Cir.1998) (*quoting Faneuil Advisors, Inc. v. O/S Sea Hawk*, 50 F.3d 88, 92 (1st Cir.1995)).[26] A salvor does not need to be absolutely certain that a vessel will be destroyed if he or she does not intervene. It is enough to reasonably apprehend a peril to the ship. *See Faneuil Advisors, Inc.*, 50 F.3d at 92. Furthermore, the threat to a vessel does not need to be imminent; it must only be probable that the vessel will be damaged or destroyed without intervention. *See Id.* at 92–93; *Fine v. Rockwood*, 895 F.Supp. 306, 309 (S.D.Fla.1995).[27] Whether a marine peril exists is a question of fact. *See Evanow*, 163 F.3d at 1114.

The services rendered to salve a vessel cannot be performed pursuant to a preexisting duty or contract. In other words, an individual's efforts to protect a vessel from peril must be voluntary. *See The SABINE*, 101 U.S. 384, 25 L.Ed. 982 (1879); *Veverica*, 488 F.2d at 882. Actions

**26.** The peril must be to the vessel, instead of to the pocketbook of the vessel's owner. Therefore, "there is no danger from which the vessel, her crew and cargo must be saved where the peril is a potential hazard to the marine environment alone .... It may be appropriate to consider averted liability in calculating the amount of a salvage award where the prerequisites for a salvage claim have been satisfied already, but averting environmental pollution by itself is an insufficient

basis for a salvage claim." *Fine*, 895 F.Supp. at 309. *See also Evanow*, 163 F.3d at 1115; *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 988 n. 17 (5th Cir.1998).

**27.** For example, if a vessel is stranded in a harbor, but is not in any danger, a salvage claim cannot arise. *See Atco, Inc.*, 1992 WL 230482 at *6.

taken pursuant to a duty owed to a third party are voluntary. Hence, when the Coast Guard salves a vessel, its actions are generally voluntary because its statutory mandate exists to protect the public, not the vessel or its owner. *See In re American Oil Co.*, 417 F.2d 164, 169 (5th Cir. 1969).[28] In addition, the Fifth Circuit indicated in dicta in *In re American Oil* that the Coast Guard has discretion whether to act and therefore its services are rendered voluntarily.[29] *Id.* at 168. A later district court case adopted this statement and held that the Coast Guard can be reimbursed for its salvage efforts. *See DFDS Seacruises (Bahamas) Ltd. v. United States,* 676 F.Supp. 1193, 1200 (S.D.Fla.1987) (characterizing the rule that Coast Guard rescue services are voluntary as "well-settled").[30]

██ Marine Salvage has asserted a valid salvage claim because it reasonably believed that the Cabot was in danger of capsizing in March of 1998 and it voluntarily and successfully acted to stabilize the vessel. Marine Salvage has not alleged that the Cabot inevitably would have capsized absent intervention, and it need not do so. *See Faneuil Advisors, Inc.,* 50 F.3d at 92. If a salvor had to demonstrate that a vessel would have surely been destroyed but for its actions, twenty-twenty hindsight would bar many, if not most, salvage awards. If the Cabot had capsized it would have destroyed the value of the ship. Mr. Kennon, Marine Salvage's President, stated at trial that it "would have cost a fortune to try and raise that ship up. The economics of it would have been horrendous and there's no telling who would've been able to come up with the money to try and raise it."[31] Moreover, Marine Salvage acted voluntarily in salving the Cabot. Mr. Kennon could not reach the vessel's owner to obtain authority before beginning to correct the list. Although Mr. Patel, the owner of the Cabot, did appear fleetingly once Marine Salvage had already begun to salve the vessel, he did not direct or ask Marine Salvage to do anything. He "just kind of agreed with everything that something had to be done and he left."[32] The fact that Mr. Patel agreed to pay for the salvage efforts after the list was already corrected does not affect the accrual of Marine Salvage's lien.

**28.** *See also Kelly v. United States,* 531 F.2d 1144, 1147 (2d Cir.1976) (stating that Coast Guard's salvage efforts are voluntary in context of a negligence claim alleged against the Coast Guard); *United States v. DeVane,* 306 F.2d 182, 186 (5th Cir.1962) (stating that Coast Guard's salvage endeavors are voluntary in the context of determining the Coast Guard's duty to those who relied on the rescue); *In re Sincere Nav. Corp.,* 327 F.Supp. 1024, 1025 (E.D.La.1971) (citing *In re American Oil* with approval, but denying the government's salvage claim on other grounds); *Markakis v. S/S Volendam,* 486 F.Supp. 1103, 1109 (S.D.N.Y.1980) (stating that the Coast Guard has no pre-existing duty in dicta). *Cf.* 3A BENEDICT ON ADMIRALTY § 78 (7th ed.1997)

**29.** The Fifth Circuit in *In re American Oil Co.* cites 14 U.S.C. § 88 for the proposition that the Coast Guard's actions were permissive. Section 88(b) states that "the Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized." 14 U.S.C. § 88(b).

**30.** *Cf. Port Tack Sailboats, Inc. v. United States,* 593 F.Supp. 597, 599 n. 2 (S.D.Fla. 1984) (stating in dicta that traditionally the Coast Guard cannot recover for rescue services and stating that the Fifth Circuit's statement in *In re American Oil* was dictum).

**31.** Unedited trial transcript, p. 42, lines 5–9.

**32.** Unedited trial transcript, p. 38, lines 5–7. *See* Section II(B) of this order for a more detailed discussion of the voluntariness of Marine Salvage's salvage efforts.

■ Like Marine Salvage, the United States has a valid salvage lien. It acted to avert a real risk to the Cabot after the M/V Tomis Future collided with the vessel in New Orleans. If the Coast Guard had not repaired the Press Street Wharf and positioned tugboats alongside the Cabot, there was a significant possibility that the Cabot would have broken free on the Mississippi river and been destroyed or severely damaged. The Coast Guard acted voluntarily because the owner of the vessel, at that time the U.S.S. Cabot Dedalo Museum Foundation, stood by and refused to act in an emergency situation, and it had no pre-existing legal duty to act.

E. *Marine Salvage has a $20,908.00 salvage claim with priority over the $70,342.68 salvage claim of the United States*

■ The Fifth Circuit has stated that the calculation of a salvage award should "create a post-hoc solution that will induce the parties to save the ship without first agreeing on terms.... In order properly to induce the salvor (and salvee) to act ... the law must provide for a proper and reasonable salvage award, one that gives neither the salvor too little incentive to do the salvage properly, nor the salvee too little reason to care if his property is saved. By definition, this 'efficient' fee is the one that would have been reached by the parties through voluntary negotiation

in an open and competitive market, and its value will depend on a number of factual considerations." *Margate Shipping Co.,* 143 F.3d at 986 (citations omitted). These factual considerations include: (1) the degree of danger from which property was rescued; (2) the value of the property saved; (3) the labor expended by the salvors in rendering salvage services; (4) the promptitude, skill, and energy displayed in rendering services and saving the property; (5) the value of the property employed by the salvors in rendering services; and, (6) the risk incurred by salvors in securing property from impending peril.[33] *See Margate Shipping Co.,* 143 F.3d at 988; *Trico Marine Operators, Inc.,* 809 F.Supp. at 443.[34]

■ Taking into account the aforementioned factors, the Court finds that Marine Salvage is entitled to reimbursement for the $20,908.00 it expended in acting to safeguard the Cabot from March 14 to March 21, 1998, and a pro rata share of the interest accrued while the sale proceeds were in the Court Registry. This salvage lien has priority over all of the other maritime claims asserted in this proceeding.[35] Marine Salvage's lien comes before that of the United States because both entities have salvage liens, and Marine Salvage's lien accrued approximately ten months after that of the United States.[36] When two entities have salvage

---

33. Liability for environmental damage may be considered under this factor, although generally avoided liability is not a valid consideration. *See Trico Marine Operators, Inc. v. Dow Chemical Co.,* 809 F.Supp. 440, 443 (E.D.La.1992).

34. The degree of danger from which the property was rescued and the value of the property saved are the most important of the these factors. *See Margate Shipping Co.,* 143 F.3d at 987–88 n. 15.

35. *See United States v. One 254 Foot Freighter, M/V Andoria,* 570 F.Supp. 413, 415 (E.D.La.

1983). *See also* 46 U.S.C. §§ 31301, 31326; Charles M. Davis, MARITIME LAW DESKBOOK 342 (1997); J. James Cooper, *Maritime Liens— What Gives You the Right to Arrest a Ship and How Do You Do It?,* 2nd Annual Admiralty and Maritime Law Conference 15 (1993); George L. Varian, *Rank and Priority of Maritime Liens,* 47 TULANE LAW REVIEW 751, 753 (1974).

36. A maritime lien accrues the moment when it can be enforced. *See Governor and Co. of Bank of Scotland v. Sabay,* 211 F.3d 261, 268, 271 (5th Cir.2000).

liens, the last lien to accrue has priority.[37]

In Section I of this order, the Court determined that the United States expended $500,868.94 to protect the Cabot after the allision with the M/V Tomis Future. However, the United States cannot claim more than $185,000.00, because that was the sale price of the Cabot, and, therefore, the value of the vessel. *See Allseas Maritime, S.A. v. M/V Mimosa,* 812 F.2d 243, 247 (5th Cir.1987). A salvor cannot claim more than the value of the vessel salved because it does not make sense to spend more money on saving an object than it is actually worth in the marketplace. Moreover, the substitute custodian's *custodia legis* expenses, the Marshals Service's fees, and Marine Salvage's salvage lien have priority over the United States' salvage lien. Once the aforementioned expenses and liens are deducted from the sale proceeds, $70,342.68 in principal remains in the Court Registry. Since the United States has asserted its salvage lien *in rem* against the Cabot, it can only look to the vessel's sale proceeds for satisfaction of the lien. Its lien consequently cannot exceed $70,342.68. The Court finds, having taken into account the factors developed by the Fifth Circuit on the amount of salvage awards, that the United States is entitled to $70,342.68 and a pro rata share of interest accrued on the sale proceeds in satisfaction of its salvage lien.

IV. *The Board of Commissioners of the Port of New Orleans and Marine Salvage have a maritime liens for necessaries that cannot be satisfied from the limited funds available in the Court Registry*

A. *The Board of Commissioners' lien for necessaries*

The Board of Commissioners seeks to enforce the September 1998 *in rem* judgment it obtained from the Eastern District of Louisiana for $399,685.48 for past due dockage charges, court costs, and 5.27 percent interest calculated from April 11, 1994 until payment. This Court ordered the Board of Commissioners to submit documentation to indicate that the Eastern District of Louisiana had *in rem* jurisdiction over the Cabot, because of the awkward scenario presented by the Board of Commissioner's efforts to enforce an *in rem* judgment that was entered while the Cabot was in this Court's custody [Dkt. No. 93]. The Board of Commissioners submitted a brief on the issue only after this Court issued a written warning that it would impose civil sanctions if the Board of Commissioners did not comply with its order [Dkt. No. 95]. In its brief, the Board of Commissioners asserted that this Court was required to give full faith and credit to the *in rem* judgment of the Eastern District of Louisiana because the issue of *in rem* jurisdiction had been fully and fairly litigated and decided by that court [Dkt. No. 97]. The Board of Commissioners attached as exhibits the Eastern District of Louisiana's final judgment, that Court's oral findings of fact and conclusions of law, and a motion to dismiss based on lack of *in rem* jurisdiction with a corresponding order denying the motion. How-

---

**37.** *See Servicios–Expoarma, C.A. v. Industrial Maritime Carriers, Inc.,* 135 F.3d 984, 990 (5th Cir.1998); *A. Coker & Co., Ltd. v. National Shipping Agency Corp.,* 1999 WL 1009808, *2 (E.D.La.1999); Charles M. Davis, MARITIME LAW DESKBOOK 342–43 (1997); Varian, *Rank and Priority of Maritime Liens* at 751–52.

ever, the Board of Commissioners failed to provide this Court with a crucial order entered *after* the motion to dismiss for lack of *in rem* jurisdiction was denied. That order states, "[t]he Board never arrested the vessel, so the Court has no *in rem* jurisdiction of it." [38] On September 6, 2000, United States District Court Judge Eldon E. Fallon entered an order amending and correcting the September 1998 judgment he had previously entered. The amended judgment states that, "[t]he Court having been advised that the judgment entered September 16, 1998 incorrectly awards judgment in favor of the plaintiff against the USS CABOT DEDALO, *in rem*, and that the Court had previously determined that the Court had no *in rem* jurisdiction over the vessel," judgment is entered solely *in personam* against the U.S.S. Cabot Dedalo Museum Foundation. This Court obtained a copy of Judge Fallon's recent order from his Chambers. The Board of Commissioners has made no effort to inform this Court that the judgment on which its claim is based has been amended.

The Board of Commissioners cannot claim priority over Marine Salvage and the United States' salvage claims based on its prior *in personam* judgment. An unsatisfied *in personam* judgment does not affect the nature of the Board of Commissioner's claim against the vessel *in rem*.[39] When the Board of Commissioners filed suit in Louisiana it asserted a maritime lien for necessaries enforceable against the Cabot *in rem*, and no judgment was entered on that claim.[40] The Board of Commissioners still has the right to assert its lien for necessaries based on the services it provided to the Cabot, however, its lien does not have priority over the salvage claims asserted in this case.[41] Since there are insufficient funds in the Court Registry to satisfy the valid salvage awards, the Board of Commissioners cannot obtain payment on its lien. Therefore, the Court rules that the Board of Commissioners take nothing.

B. *Marine Salvage's lien for necessaries*

Marine Salvage provided wharfage and other services to the Cabot that entitle it to assert a lien for necessaries

**38.** The Board of Commissioners of the Port of New Orleans vs. the U.S.S. Cabot Dedalo, *in rem*, and the U.S.S. Cabot Dedalo Museum Foundation, Inc., *in personam*, Civil Action Number 94–932, Section J(4), Dkt. No. 44.

**39.** *See Port Ship Service, Inc. v. International Ship Management & Agencies Service, Inc.*, 800 F.2d 1418, 1421 (5th Cir.1986); *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir.1986) ("The maritime lien is a lien on the vessel, and only indirectly, inasmuch as it conflicts with the owner's rights in the vessel, it is connected with the owner. The maritime lien concept thus somewhat personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner" (citations omitted).); *USL Capital v. New York 30*, 975 F.Supp. 382, 384–85 (D.Mass.1996); *Southern Oregon Production*, 435 F.Supp. at 459–60.

**40.** Initially, judgment was entered *in rem* on the Board of Commissioner's maritime lien, but as discussed *supra*, that judgment was amended on September 6, 2000 to omit the *in rem* award because the Eastern District of Louisiana did not have *in rem* jurisdiction when it issued the original judgment.

**41.** *See One 254 Foot Freighter, M/V Andoria*, 570 F.Supp. at 415. *See also* 46 U.S.C. §§ 31301, 31326; *Silver Star Enterprises, Inc. v. Saramacca MV*, 82 F.3d 666, 668 (5th Cir. 1996); *Equilease Corp.*, 793 F.2d at 603; Charles M. Davis, Maritime Law Deskbook 342 (1997); J. James Cooper, *Maritime Liens— What Gives You the Right to Arrest a Ship and How Do You Do It?*, 2nd Annual Admiralty and Maritime Law Conference 15 (1993); George L. Varian, *Rank and Priority of Maritime Liens*, 47 Tulane Law Review 751, 753 (1974).

714

against the Cabot *in rem.*[42] At trial, Marine Salvage submitted receipts that indicate that it expended $56,872.39 on providing necessaries to the Cabot. Regardless of the merits of Marine Salvage's claim, as with the claim of the Board of Commissioners, there are only sufficient funds in the Court Registry to allow payment on the valid salvage claims that have been asserted in this case. The Court therefore rules that Marine Salvage cannot obtain satisfaction of its lien for necessaries through this proceeding.

---

**42.** *See supra* Section I of this order for additional information on Marine Salvage's maritime claims. *See supra* Section IV(A) for citation to cases and statutes that define the parameters for maritime liens for necessaries.