**FANUEIL ADVISORS**

v.

**SEA HAWK.**

No. 93–549–L.

United States District Court,
D. New Hampshire.

Aug. 23, 1994.

Matthew H. Upton.

Lawrence J. Mullen.

Paul McEachern.

## ORDER

LOUGHLIN, Senior District Judge.

This case involving a boat known as the Sea Hawk is governed by Maritime Law.

The plaintiff brought this action to foreclose its First Preferred Ship Mortgage on the vessel Sea Hawk. Portsmouth Harbor Towing (PHT) is an intervenor in this action.

The Sea Hawk is a 1974, 45 foot "Hatteras" fiberglass motor vessel. David Kinchla owned the vessel. Kinchla on January 12, 1988 executed a Note and Marine Security Agreement to Yegen Marine, a division of Yegen Associates, Inc., in the principal amount of $148,000.00 to finance the purchase of the Sea Hawk. The note was as-

signed to Atlantic Financial Federal and Loan Association on January 13, 1988 by Yegen Associates, Inc.

On August 22, 1988 Kinchla granted a first preferred ship mortgage on Sea Hawk to Atlantic Financial Federal Savings and Loan Association. Subsequently on November 17, 1988 this mortgage was duly recorded with the U.S. Coast Guard Vessel Documentation Office for Boston, Massachusetts. "Atlantic Financial Savings, F.A." thereafter became the lawful successor-in-interest to Atlantic Financial Federal Savings and Loan Association.

Eventually Atlantic Financial Savings, F.A. went into receivership and was taken over by Resolution Trust Corporation (RTC).

Joseph Coyne a principal of the plaintiff, Fanueil Advisors (FA) testified that the management firm was formed in January, 1993. On April 23, 1993 the RTC, in its capacity as receiver for Atlantic Financial Savings, F.A. accepted a bid of $1,516,000.00 from the plaintiff on a book value of assets of 6.1 million dollars for fifty-six loans one of which was the Sea Hawk.

The plaintiff recorded the assignment of mortgage with the U.S. Coast Guard Vessel Documentation Office for Boston, Massachusetts on September 15, 1993.

Kinchla, apparently falling on hard times, failed to make payments on his note after May 20, 1991. On January 6, 1992 Kinchla filed a voluntary Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of New Hampshire.

The saga continues. Going back in time, the court by agreement of counsel read the deposition of William J. Cronin.

In July, 1992 he was employed by the New Hampshire State Port Authority as Harbormaster full-time for the State of New Hampshire, assigned specifically to the Hampton–Seabrook Harbor.

Cronin filed an incident report relative to the Sea Hawk which involved two separate incidents one occurring on June 3, 1992 the other on July 15, 1992.

With respect to the June 3, 1992 incident, Cronin was notified that the Sea Hawk had broken loose from its mooring and had become snagged approximately one quarter of a mile from the Hampton River Bridge. He contacted Kinchla who informed Cronin that he no longer had an interest in the boat and had abandoned it as he understood the mortgagee was foreclosing on it. Kinchla also stated that he had tied it to the mooring in October, 1991.

Cronin made several attempts to locate the bank reportedly holding the first mortgage without success, so he recontacted Kinchla. Kinchla informed him that the original bank had failed and the FDIC was involved.

One Ray Gilmore came to Cronin's succor and towed the Sea Hawk to his mooring in Hampton Harbor.

On July 15, 1992 at 0512 hours Cronin was notified that two unidentified men were towing the Sea Hawk to sea. In the process of towing the Sea Hawk, it struck the bridge causing considerable damage to the hull.

Cronin believed the Sea Hawk was being stolen. The Coast Guard was notified and took the Sea Hawk in tow returning it to Hampton Harbor. Kinchla and his son were the ones attempting to tow the Sea Hawk. Kinchla, Senior was arrested and charged with theft and brought to the Hampton Police Station.

Cronin inspected the Sea Hawk, and although not an engineer, thought that it was seaworthy as the damage was above the water line.

After the July 15, 1992 incident Gilmore stated that he did not want to have anything further to do with the vessel.

Cronin then contacted the intervenor and claimant PHT by calling Captain Stephen Holt.

Stephen Holt testified. He and Walter Dunfey are partners and owners of PHT.

Holt stated that Cronin called him on July 15, 1992 requesting that his company salvage the vessel. Cronin stated in his deposition at page 41 that he informed Holt that he wanted the boat to remain in New Hampshire and in dry storage as he feared that another attempt might be made to remove the boat.

Cronin did not recall any specific discussions with Holt concerning a salvage job. Cronin deposition page 42. At page 46 of Cronin's deposition he then stated that in his mind it was a tow job. Holt on the other hand unequivocally stated that in his conversation with Cronin it was a salvage job. Holt towed the boat from Hampton Harbor to Portsmouth Harbor. Dunfey relieved him at the harbor entrance as Holt had another job to go to.

Dunfey towed the boat to Patton's Yacht Yard in Eliot, Maine were it was hauled and then removed to a dock in Portsmouth, New Hampshire.

There is no question that PHT, the intervenor, while it had possession of the boat from July 15, 1992 until the boat was seized by United State Marshals on December 3, 1993, kept the Sea Hawk seaworthy by doing a prodigious amount of work on the boat. Without the intervenor, maintenance of the Sea Hawk during the eighteen months that it was in its possession, the boat would have been a worthless hulk.

For example, PHT was required to pump the bilge twice weekly to prevent it from sinking, antifreeze was drained and replaced, it was kept free of ice and snow during the winter of 1992–93, lights were kept on, engine room heated and the vessel was watched so nothing untoward could happen to it.

Expenses incurred by PHT of $24,606.00 from July 15, 1992, through November 30, 1993 and attorney fees of $6,279.04 totaling $32,885.04 the court finds to be more than reasonable.

Procedurally the following also happened. After becoming the holder of the mortgage on the Sea Hawk on May 25, 1993 the plaintiff in October, 1993 sought relief from automatic stay in the Bankruptcy Court of the district and filed a complaint in this court seeking arrest of the Sea Hawk.

DISCUSSION

■ A seminal case setting forth the law of salvage is *Wijsmuller v. United States,* 702 F.2d 333 (2nd Cir.1983). The court cites from that case the maritime law apposite to salvage.

The law of salvage occupies a unique position in the Anglo–American legal system. The equitable doctrine of salvage was adopted by Anglo–American jurisprudence from the Roman law, providing for a reward to the salvor volunteer for his efforts based on the circumstances of the case and proportionate to the dangers involved. *Id.* at 337.

■ Salvage is the "service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended...." *Id.* at 338. In order to determine whether a salvage service was performed, a court must find three specific elements: *marine peril, service voluntarily rendered, not required by duty or contract; and success in whole or in part,* with services rendered having contributed to such success. *Id.,* (quoting *The "Sabine",* 101 U.S. 384, 25 L.Ed. 982 (1880)); see *Elrod v. Luckenbach S.S. Co.,* 62 F.Supp. 935, 936 (S.D.N.Y.1945).

■ In order to establish salvage, there must be peril which is present and impending, however it need not be immediate or absolute. "A situation of actual apprehension, though not of actual danger, is sufficient." *Id.,* (quoting *The Plymouth Rock,* 9 F. 413, 416 (S.D.N.Y.1881).

■ The second element in salvage is voluntary service. Professional salvors—who perform their services for monetary gain—may claim salvage awards. *Id.*

The final element for salvage is either partial or complete success. The services rendered must have contributed to that success. *Id.* at 339.

■ The final component is success in whole or in part with the service rendered by the salvor having contributed to the ultimate success. Lack of success precludes the granting of a salvage award. *Benedict,* supra, § 88.

The Sea Hawk was sold for $32,500.00 and that sum is being held in escrow by agreement of the parties pending resolution of this litigation by the court.

The issue to be decided by the court is the relative priority of the claims of plaintiff and PHT.

Plaintiff's claim is based upon its status as the holder of a preferred ship mortgage in accordance with the Ship Mortgage Act of 1920, 46 U.S.C. § 31322, et seq. As of the date of the trial the amount owed was $177,-676.00 with interest accruing at a rate of $36.99 per day. Plaintiff is also seeking costs and attorney's fees.

PHT claims that it has priority status according to salvage liens as "preferred maritime liens" under 46 U.S.C. § 31301(5)(F) which liens have priority over "preferred mortgage liens" in the distribution of a vessel auction proceeds. Reference is made to 46 U.S.C. § 31326(b)(1).

Veritably, when PHT on July 15, 1992 took possession of the Sea Hawk it was not at that time unseaworthy and in immediate danger of sinking.

Considering the conglomeration of events that transpired while the boat was in the possession of PHT there is little or no doubt in the court's mind that the Sea Hawk would have sunk or deteriorated to the point that it would have been a derelict or worthless hulk or only a paltry amount would have been realized on a forced sale without the intervention of PHT.

Evaluating the case from an equitable or practical point of view without the intervention of PHT in July 15, 1992 the bid of FAI in April, 1993 which is similar to a pig in the poke purchase from a monetary point of view would have been nugatory.

Further PHT acted more than reasonably by attempting to ascertain who the lienholder might be. Unfortunately, due to the legal problems involving the insolvency, Atlantic Financial Savings F.A. and the legal convolutions when the FDIC and/or Resolution Trust become involved assessing who owns what, was an almost insurmountable or herculean task.

The court finds that PHT has met the criteria enunciated in *Wijsmuller*, supra. The peril was not immediate or absolute. Events as already related by this court showed that there was actual apprehension, though not of actual danger. Gilmore had washed his hands and would not longer deal with the Sea Hawk. Cronin, who seems to need a mnemonic, wanted an immediate solution so he would be freed of an untoward situation. The Coast Guard did what it had to do and disembarked from the scene leaving any possible criminal charges against Kinchla to be pursued by Cronin through the auspices of the Hampton Police Department. But for PHT as heretofore stated and its expensive remedial action there is no doubt in the court's mind that the boat would have deteriorated and become valueless. Further irony in the case was the testimony of Captain Dunfey that if a lien holder had timely come forth after PHT had repaired the Sea Hawk, it could have been sold for more than double the price realized at auction.

There can be little doubt that PHT, as professional salvors, met the second element as volunteers.

The third or final component success, or partial success is also self evident from the findings of the court. The time money and expenses expended by PHT together with the fact that the Sea Hawk was saleable at an auction and could have commanded more than twice that amount if a lien holder had come forward sooner evidences success.

From an equitable standpoint regarding two competing claims, the plaintiff on the one hand became an extant corporation in January, 1993, five and one-half months after PHT salvaged the Sea Hawk. On April 23, 1993 the plaintiff purchased fifty-six loans, one of which was the Sea Hawk. This was sight unseen without any knowledge of where the boat was or what had happened to it. As the court has already stated, this was a pig in a poke purchase. The loans purchased were at approximately one-sixth of their putative original value. While not dilatory, the plaintiff did not become holder of the mortgage until May 25, 1993 and it was not until October, 1993 that the plaintiff sought an automatic stay in the bankruptcy court. Additionally, before acquiring the mortgage the plaintiff had notice by letter dated February 10, 1993 from intervenor's counsel of its salvage claim. It is not fair or equitable that

the plaintiff should reap the benefits bestowed on the Sea Hawk by P.H.T. when it contributed nothing to its well being.

On the other side of the coin, without the services of PHT the Sea Hawk would not have existed. PHT acted very reasonably in this matter. It not only kept the Sea Hawk seaworthy it also diligently attempted to ascertain who had legal title to the boat.

The court finds that the intervenor, PHT has a salvage claim and also equitable considerations opting for its priority of claim in this case in addition to its priority under its salvage claim.

Judgment for the intervenor in the sum of $32,885.04.