USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1959 FANEUIL ADVISORS, INC., Plaintiff, Appellant, v. O/S SEA HAWK, (O.N. 559409), HER ENGINES, TACKLE AND APPURTENANCES, IN REM, __ ___ Defendant, Appellee. __________________ PORTSMOUTH HARBOR TOWING, Intervenor, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Martin F. Loughlin, Senior U.S. District Judge] __________________________ ____________________ Before Selya, Boudin and Stahl, Circuit Judges. ______________ ____________________ Harry Barnett with whom Timothy R. McHugh, Lawrence J. Mullen, _____________ __________________ ___________________ and Hoch & McHugh were on brief for appellant. _____________ Paul McEachern with whom Shaines & McEachern, P.A. was on brief ______________ __________________________ for Portsmouth Harbor Towing, intervenor - appellee. _____________________ March 29, 1995 _____________________ STAHL, Circuit Judge. Plaintiff-appellant Faneuil STAHL, Circuit Judge. _____________ Advisors, Inc. ("Faneuil"), appeals the district court's order subordinating Faneuil's preferred ship mortgage on the O/S Sea Hawk to the salvage claim of intervenor-appellee Portsmouth Harbor Towing ("PHT"). Because the district court predicated its order on a misunderstanding of the applicable law, we reverse. I. I. __ BACKGROUND BACKGROUND __________ The Sea Hawk is a forty-five foot Hatteras sport- fishing boat built in 1974. David Kinchla, its owner during the time relevant to this case, purchased the boat in January 1988. In August 1988, Kinchla granted a first preferred ship mortgage on the Sea Hawk to Atlantic Financial Federal Savings and Loan Association ("Atlantic"), which held Kinchla's $148,000 note executed in association with his purchase of the boat. Atlantic eventually went into receivership and was taken over by the Resolution Trust Corporation ("RTC"). On April 23, 1993, Faneuil purchased Kinchla's note and the preferred ship mortgage on the Sea Hawk from the RTC as part of a pool of fifty-six non- performing boat loans for a total price of $1,516,000. As Kinchla's mortgage was making its way through the receivership netherworld, Kinchla was losing his grip on the Sea Hawk. He stopped making payments on his note in May -2- 2 1991 and filed a Chapter 11 bankruptcy petition on January 6, 1992. On June 3, 1992, the Sea Hawk broke loose from its mooring in the Hampton-Seabrook Harbor ("Hampton Harbor") and drifted until it became snagged near the Hampton River Bridge. Harbormaster William J. Cronin, an employee of the New Hampshire State Port Authority, enlisted the aid of the U.S. Coast Guard, which towed the boat to the state pier in Hampton Harbor. Cronin contacted Kinchla, but Kinchla told Cronin that he had abandoned his interest in the boat and that the mortgage-holder intended to foreclose on it. Cronin testified at his deposition (which was admitted in evidence) that he attempted to reach the mortgage-holder but had no success, apparently due to the RTC receivership.1 Because the state has no facility of its own at Hampton Harbor to store a boat as large as the Sea Hawk -- the state pier being a busy, commercial fishing pier -- Cronin arranged for one Ray Gilmore to take custody of the boat until its ownership could be sorted out, explaining to Gilmore that he would have a possessory lien on the boat for reasonable towing and storage fees. On July 15, 1992, shortly after 5 a.m., Kinchla and his son attempted to retake possession of the Sea Hawk by surreptitiously removing it from Gilmore's mooring in the  ____________________ 1. The record does not indicate exactly when Atlantic went into receivership. -3- 3 harbor and towing the vessel under the Hampton River Bridge and out to sea. They did not request an opening of the drawbridge, however, and in attempting to maneuver the Sea Hawk under the bridge, lost control of it in the current. The Sea Hawk slammed broadside into a bridge support, damaging the vessel's hull, and then slid under the bridge stern-first, damaging the boat's bridge-superstructure and outrigger tuna poles. The Coast Guard soon intercepted the Kinchlas and took them and the Sea Hawk back to the state pier. Kinchla told Harbormaster Cronin that his attorney had advised him to retake the boat; both Kinchla and his son were turned over to the police, and Kinchla was arrested. Gilmore wanted no further involvement with the Sea Hawk, leaving Cronin once again with the problem of what to do with the beleaguered boat. Here the tales diverge. Stephen Holt, one of PHT's partners, testified that Cronin contacted him and asked if PHT would tow the boat to Portsmouth, New Hampshire, and store it safely in dry storage. Holt claimed that, in a conference call with the Coast Guard, Cronin specifically told Holt that this would be a "salvage job." Cronin testified that he could not remember with whom he spoke at PHT, whether he mentioned the word "salvage," or even whether the topic of PHT's compensation ever came up. Cronin testified that in his mind, this was a tow job. In any -4- 4 event, Holt accepted the task, and he and his son went to Hampton to bring back the Sea Hawk. Both Holt and Cronin inspected the boat and determined that it was in no danger of sinking despite the damage it had just sustained.2 Holt and his son then towed the boat out to open ocean and up the coast to Portsmouth Harbor, a two-and-one-half-hour trip. Initially, PHT stored the boat at Patton's Yacht Yard in Eliot, Maine. Because PHT was paying for this storage out of its own pocket, however, and, ostensibly, for insurance reasons, PHT soon moved the Sea Hawk to its own dock in Portsmouth, where Holt and his partner, Walter Dunfey, actively maintained the boat and performed some repairs. PHT attempted to contact the mortgage-holder on several occasions to establish their claim, but were unable to locate definitively any party claiming an interest in the boat.3 PHT never brought an action to foreclose its claimed salvage lien.  ____________________ 2. Indeed, Holt was prepared to place his eleven-year-old son aboard the Sea Hawk to help steer it during the trip back to Portsmouth, but changed his plans after determining that the Sea Hawk had lost its steering. 3. On February 10, 1993, an attorney for PHT sent a letter to Prentiss Properties of Dallas, Texas, which assembled the loan documents for the RTC's pool of assets that Faneuil purchased, informing it of PHT's "salvage and storage claim." Faneuil apparently received this letter at some point, because it included it in the motion for relief from the automatic stay it filed in Kinchla's bankruptcy proceeding in the fall of 1993. -5- 5 Finally, on October 26, 1993, with the bankruptcy court's permission, Faneuil filed a complaint in the district court initiating this in rem proceeding against the Sea Hawk __ ___ to foreclose its mortgage. Federal marshals arrested the vessel on December 2, 1993, and moved it to dry storage in Newington, New Hampshire. PHT intervened in January 1994 asserting its salvage lien. The Sea Hawk was sold at auction on April 22, 1994, yielding $32,537.20 after deductions for custodia legis expenses. That amount was placed in escrow, ________ _____ pending resolution of PHT's and Faneuil's competing claims to the sale proceeds. The amount due under Faneuil's mortgage at the time of trial was $177,676; PHT claimed expenses of $24,606 plus attorney fees of $6,279.04, or a total of $30,885.04, in addition to a claimed salvage award of 20% of the value of the vessel.4 Following a one-day bench trial, the district court held that, under the law of admiralty and the federal statutory scheme for disbursing proceeds from a foreclosure sale of a vessel, PHT had a valid salvage claim that had priority over Faneuil's preferred ship mortgage, and also that, because it had expended much time and effort in preserving the Sea Hawk while Faneuil's purchase of the  ____________________ 4. PHT's requested expenses included $1,205 in towing and repairs and $23,101 in marina charges, calculated at $1 per day per foot, or approximately $1,400 per month for sixteen months of storage. Great Bay Marina, which stored the Sea Hawk for the U.S. Marshal pending the foreclosure sale, charged a total of $900 for a period of approximately five months. -6- 6 mortgage was "a pig in the poke," the equities dictated that PHT should recover first. Finding all of PHT's expenses reasonable, the district court awarded PHT $32,885,5 exhausting the sale proceeds. Faneuil now appeals, arguing that the district court erred in ruling that PHT had a claim for salvage or any other claim that should prime Faneuil's mortgage.6 II. II. ___ DISCUSSION DISCUSSION __________ A. Standard of Review ______________________ We may not set aside the district court's factual findings unless they are clearly erroneous. Dedham Water Co. ________________ v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. ____________________________ 1992). Where factual findings are predicated upon errors of law, however, we accord them diminished deference. Id. See ___ ___ also B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, ____ ______________________ _____________ 342 (2d Cir. 1983) ("Generally an appellate court will not reverse a salvage award unless the district court yielded to an erroneous principle, plainly misapprehended the facts . .  ____________________ 5. This is $2,000 more than claimed. The court's mathematical error was apparently induced by PHT's trial brief, which contained the same $2,000 error. 6. Faneuil attacks on appeal other aspects of the district court's ruling, in particular its failure to make specific findings justifying the amount of PHT's salvage award. Our holding as to Faneuil's primary issue on appeal obviates the need for any discussion on these other issues. -7- 7 . or granted an award that was clearly inadequate or unreasonably excessive."). B. The Statutory Scheme ________________________ The relative priorities of preferred ship mortgages and salvage claims are set forth in the Ship Mortgage Act of 1920 (codified as amended in 1988 by Pub. L. No. 100-710, 102 Stat. 4735, at 46 U.S.C. 30101-31343). Congress passed the Act in order to provide greater protection to private investment in the shipping industry. Chase Manhattan Fin. _____________________ Servs., Inc. v. McMillian, 896 F.2d 452, 458 (10th Cir. _____________ _________ 1990); Merchants & Marine Bank v. The T.E. Welles, 289 F.2d ________________________ _______________ 188, 193-94 (5th Cir. 1961). Prior to the Act's passage, a mortgage on a ship was outranked in admiralty proceedings by ordinary maritime liens on the ship, even those arising after the mortgage. McMillian, 896 F.2d at 458. The Act changed _________ the law by granting the holders of preferred ship mortgages "priority over all claims against the vessel (except for ___ expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens)." 46 U.S.C. 31326(b)(1) (emphasis added). There are just six categories of preferred maritime liens; one of these categories is liens for salvage. 46 U.S.C. 31301(5).7 However, liens for  ____________________ 7. The subsection defines a preferred maritime lien as a maritime lien on a vessel-- (A) arising before a preferred mortgage was filed under section 31321 of this -8- 8 "necessaries," which include "repairs, supplies, towage, and the use of a dry dock or marine railway," 46 U.S.C. 31301(4), are ordinary, and are thus subordinate to a preferred ship mortgage. C. The Law of Salvage ______________________ The admiralty doctrine of salvage, which rewards volunteers who save ships from dangers at sea, is an equitable doctrine that dates back to the Romans. Wijsmuller, 702 F.2d at 337. To establish a salvage claim, __________ PHT must prove three elements: "`1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or . . . service [contributing] to such success.'" Clifford v. M/V Islander, 751 F.2d 1, 5 (1st Cir. 1984) ________ ____________ (quoting The Sabine, 101 U.S. (11 Otto) 384 (1879)). In this __________ case, Faneuil contends that PHT's claim for salvage must fail because the Sea Hawk was never in "marine peril," which, as we stated in Clifford, ________  ____________________ title; (B) for damage arising out of maritime tort; (C) for wages of a stevedore when employed directly by a person listed in section 31341 of this title; (D) for wages of the crew of the vessel; (E) for general average; or (F) for salvage, including contract salvage[.] -9- 9 occurs when a vessel is exposed to any actual or apprehended danger which might result in her destruction. "All services rendered at sea to a vessel in distress are salvage services. It is not necessary . . . that the distress should be immediate and absolute; it will be sufficient if, at the time the assistance is rendered, the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered." Reasonable apprehension of peril, whether actual or not, is enough. 751 F.2d at 5-6 (quoting M. Norris, The Law of Salvage 63, ___________________ at 97). Marine peril has been found to exist in a variety of circumstances, including where a vessel: had run aground on a rocky ledge, Wijsmuller, 702 F.2d 333; was adrift with no __________ power within a short distance of the coast, The Plymouth _____________ Rock, 9 F. 413 (S.D.N.Y. 1881); was docked but was close to a ____ fire, The John Swan, 50 F. 447 (S.D.N.Y. 1892); was on course _____________ at sea but where its crew was stricken with yellow fever, Williamson v. The Alphonso, F. Cas. No 17749 (C.C. Mass. __________ _____________ 1853). On the other hand, courts have found no marine peril where a vessel: had been holed but was secured in calm weather and was not sinking, Clifford, 751 F.2d 1; had ________ drifted out to sea during a hurricane but subsequently came to rest and held fast on a mooring in calm waters, Phelan v. ______ Minges, 170 F. Supp. 826 (D. Mass. 1959); was adrift as the ______ result of bad weather but could have returned to port under its own power once the weather cleared, The Viola, 52 F. 172 _________ (C.C. Pa. 1892), aff'd, 55 F. 829 (3d Cir. 1893). _____ -10- 10 PHT does not contend, and the district court did not find, that the damaged Sea Hawk was unseaworthy or in immediate danger of sinking when PHT took possession of it at the state pier on July 15, 1992. The district court apparently predicated its finding that PHT had satisfied its burden with regard to "marine peril" on the fact that the Sea Hawk was essentially an orphaned vessel, and eventually __________ "would have sunk or deteriorated to the point that it would have been a derelict or worthless hulk" had PHT not volunteered as guardian:8 The peril was not immediate or absolute. Events as already related by this court showed that there was actual apprehension, though not of actual danger. Gilmore had washed his hands and would not longer deal with the Sea Hawk. Cronin, who seems to need a mnemonic, wanted an immediate solution so he would be freed of an untoward situation. The Coast Guard did what it had to do and disembarked from the scene . . . . But for PHT as heretofore stated and its expensive remedial action there is no  ____________________ 8. PHT advances other possible bases for a finding that marine peril existed: Cronin's testimony that he feared that Kinchla might return and try to steal the boat again or, even worse, that he might sink it for insurance proceeds, and that therefore Cronin had to move the boat out of Hampton Harbor. This argument is preposterous. First, Kinchla had just been arrested for trying to retake his boat; he was not likely to ________ make another attempt anytime soon. Second, even if another attempt by Kinchla to seize his boat would have been unlawful, it would not necessarily have posed any grave peril to the boat. Third, Cronin's concern about Kinchla sinking ____ the boat for insurance seems entirely unfounded: Kinchla was more than a year behind in his mortgage payments on the boat, and the record contains no indication that Kinchla was any more punctual in paying insurance premiums. -11- 11 doubt in the court's mind that the boat would have deteriorated and become valueless. Faneuil Advisors v. Seahawk [sic], No. 93-549-L, 1994 WL _________________ _______ 484380, at *4 (D.N.H. Aug. 23, 1994). In holding that these circumstances constituted a reasonable apprehension of marine peril, the district court misreads the salvage cases holding that marine peril need not be immediate or absolute. While it is true that the threat need not be imminent, see, e.g., Williamson v. The Alphonso, ________ ___ ____ __________ ____________ F. Cas. No 17749, the cases make apparent that the threat must be something more than the inevitable deterioration that any vessel left untended would suffer; otherwise ordinary maintenance, repairs and storage -- i.e., "necessaries" -- could easily give rise to salvage liens if a vessel's owner were particularly negligent in caring for his or her boat. Such a result could hardly be squared with the intent of the Ship Mortgage Act. Moreover, in stating that it had "no doubt" that the Sea Hawk would have become a worthless hulk without PHT's intervention, the district court glossed over an important fact: once the Sea Hawk was intercepted by the Coast Guard and delivered to Cronin at the state pier, the boat was in the custody of the State of New Hampshire, which certainly had the authority, and perhaps the duty, to remove the vessel from the harbor and store it in a safe location. See, e.g., ___ ____ -12- 12 N.H. Rev. Stat. Ann. 271-A:8 (1987) (giving harbormasters authority, inter alia, "to require the removal of vessels if _____ ____ necessity or an emergency arises"); N.H. Rev. Stat. Ann. 270-B1 to -B7 (1987) (giving director of safety services or representative authority to impound or order the removal and storage of abandoned boats, and imposing lien on such boats for all reasonable charges associated therewith). As already stated, the Sea Hawk was in no imminent danger of sinking. We fail to see how such a boat, in the safe custody of a state officer with statutory authority to provide for its safekeeping, can possibly be said to be facing "marine peril," or how any such peril could reasonably be apprehended. The district court stated that Cronin "wanted an immediate solution so he would be freed of an untoward situation." Id. This is not marine peril; it is mere ___ inconvenience, and the state cannot transform an unwanted tow-and-store job into a salvage job simply by declaring it to be such (if that is in fact what Cronin attempted to do, as Holt's testimony suggests). We have scoured the salvage cases and located not a single one in which a seaworthy vessel in the safe possession of the state was found to be in marine peril. Thus, we hold that the district court's finding that there was reasonable apprehension of marine peril incorporated clearly erroneous factual assumptions and -13- 13 was predicated on an erroneous understanding of the applicable law. We hold that, under these circumstances, PHT has failed to prove marine peril or reasonable apprehension thereof, and therefore it has failed to prove an essential element of its salvage claim. D. The District Court's Alternative Holding ____________________________________________ We have also considered whether PHT might be entitled to recover on the basis of the district court's implicit alternative ground for its holding -- namely, that "[i]t is not fair or equitable that the plaintiff should reap the benefits bestowed on the Sea Hawk by [PHT] when it contributed nothing to its well being." Faneuil Advisers, ________________ 1994 WL 484380, at *4. Nevertheless, the statutory scheme permits no contrary conclusion: Congress clearly intended to afford holders of preferred ship mortgages considerable protections against irresponsible actions by ship owners, and the exceptions to their priority status are explicitly spelled out. See 46 U.S.C. 31301(5), 31326(b)(1). A lien ___ for necessaries, even one obtained by the state or its agent under state law, is not among those exceptions. In fact, any argument that such a lien might have priority would appear to be entirely foreclosed by 46 U.S.C. 31307: "This chapter supersedes any State statute conferring a lien on a vessel to -14- 14 the extent the statute establishes a claim to be enforced by a civil action in rem against the vessel for necessaries."9 While the result we reach may appear harsh, the priority scheme simply allows for no judicial reordering on expansive notions of equity where the mortgage holder has engaged in no inequitable conduct that might justify subordination of his claim. See Maryland Nat'l Bank v. The ___ ___________________ ___ Vessel Madam Chapel, No. 93-55905, 1995 WL 25833, at *6 (9th ____________________ Cir. 1995) (holding that equitable subordination generally requires inequitable conduct by mortgagee and reversing order that had subordinated preferred ship mortgage). It may well be that other doctrines might supply some basis for relief in cases such as this one. But no such argument has been made on appeal, and this is hardly a case for us to attempt to find a basis on which to remand in order to explore issues that have never been raised. CONCLUSION CONCLUSION __________ For the foregoing reasons, the order of the district court is  ____________________ 9. That a state statutory lien is superseded should come as no surprise; not even the federal government's claims against a vessel are given special dispensation from the priority scheme. See General Elec. Credit Corp. v. Oil Screw Triton, ___ __________________________ _________________ VI, 712 F.2d 991, 995 (5th Cir. 1983) (holding that __ government's claim for expenses in capturing and preserving vessel seized for violation of narcotics laws -- incurred before ship came within court's custody -- could not be ___ classified as custodia legis expenses, and thus were primed ________ _____ by preferred ship mortgage). -15- 15 Reversed. Costs to appellant. Reversed. Costs to appellant. ________ __________________ -16- 16