Paul E. LaPLANTE, Johanne G. La-Plante and Northern Insurance Company of New York, Plaintiffs,

v.

SUN COAST MARINE SERVICES, INC., d/b/a Sea Tow Services Savannah, and d/b/a Sea Tow/Sea Spill Savannah–Hilton Head and Sea Tow Services International, Inc. d/b/a/ Sea Tow Services of Savannah, Defendants.

No. 9:00–305–23.

United States District Court,
D. South Carolina,
Beaufort Division.

March 28, 2003.

John Rhett Crosswell Bowen, Laughlin and Bowen, Hilton Head Island, for Paul E La Plante, Johanne G La Plante, Northern Insurance Company of New York, plaintiffs.

Edward D. Buckley, Jr., Laura Constance Johnson, Young Clement Rivers and Tisdale, Charleston, for Sun Coast Marine Services Inc dba Sea Tow Services Savannah dba Sea Tow–Sea Spill Savannah–Hilton Head, Sea Tow Services International Inc dba Sea Tow Services Savannah dba Sea Tow/Sea Spill Savannah—Hilton Head, Northern Insurance Company of New York, defendants.

## ORDER

COOK, District Judge.

This litigation involves a claim by the Plaintiffs, Paul E. LaPlante and his wife,

Johanne G. LaPlante, both of whom contend that the Defendants, Sun Coast Marine Services, Inc., and Sea Tow Services International Inc., caused them to sustain substantial damages to their vessel, the M/V St. Yves, in August 1999. The co-Plaintiff, Northern Insurance Company of New York ("NINY"), served as the Plaintiffs' insurer and is the subrogee to the LaPlantes' insurance contract. In addition to denying these allegations, the Defendants filed a counterclaim, seeking to obtain monies for a claimed breach of contract.[1]

The Court, having fully considered all of the pertinent materials in the official record, the testimony of the witnesses during the trial which commenced on October 23, 2002, other relevant evidence, and the parties' post-trial briefs, submits the following findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

For the reasons that are set forth below, the Court finds that the Plaintiffs have failed to carry their burdens of proof in the instant cause. Hence, a judgment shall be entered against them and in favor of the Defendants on all claims. Furthermore, the Court concludes that the Defendants have carried their burden of proof on their counterclaim and enters a judgment in the sum of $29,131.44 in their favor on the counterclaim.

## FINDINGS OF FACT

During all of the times that are relevant to this proceeding, the Plaintiffs, Paul E. LaPlante and his wife, Johanne G. LaPlante,[2] were the owners of a vessel ("the St. Yves") which was purchased by them on August 12, 1999 for five hundred thirty-five thousand ($535,000.00) dollars. 95:22–96:2.[3] The "St. Yves" was a 1983 sixty-one (61') foot Hatteras motor yacht, which weighed approximately eighty thousand (80,000) pounds with a draft of almost five (5') feet and a beam of eighteen (18') feet. 126:22–23. It was powered by twin 12V71 Detroit Diesel engines and was capable of achieving a top speed of approximately 15.5 knots. The hull was made of fiberglass. Defs. Ex. 9.

The Defendants in this action own and operate a maritime towing and salvage services company with locations throughout the state of South Carolina and as well as various states located along the Atlantic Ocean.

Shortly after they completed their purchase of the St. Yves, it was the Plaintiffs' intention to transport this vessel from Fort Lauderdale, Florida to their home in the Boston, Massachusetts metropolitan area, with the assistance of Paul E. LaPlante's brother, John LaPlante, and a friend, Ricky Stokes. 34:15–17.[4] However, despite their intention to undertake this voyage to Massachusetts, none of them (1)

---

1. The Defendant, Sea Tow Services International, Inc., d/b/a Sea Tow Services of Savannah, was dismissed by the Court prior to the commencement of the trial for lack of personal jurisdiction. Thus, the only viable Defendant in this cause is Sun Coast Marine Services Inc., who will be identified in this proceeding as "Sea Tow."

2. Other than serving as a nominal party to this lawsuit in her capacity as an owner of the damaged vessel, Plaintiff Johanne G. LaPlante was neither an active participant in the activi-ties upon which the parties' respective claims were based nor a witness during the trial.

3. The numbers referenced to support various findings of fact reflect the corresponding page number and line number of the trial transcript.

4. Paul E. LaPlante is the owner of a wholesale bakery in Massachusetts, whereas John LaPlante and Ricky Stokes are professional commercial airline pilots. 32:19–20; 36:23–25; 39:24–25.

possessed a Coast Guard captain's license, or (2) had any meaningful experience in operating this vessel in the Atlantic Ocean. 210:8–14; 303:23–304:2; 124:14–126:2; 165:18–166:2; 170:10–14; 206:13–19.

On August 17, 1999, these three men boarded the St. Yves and traveled in a northerly direction from Fort Lauderdale, Florida to the Ponce De Leon Inlet near St. Augustine, Florida, where they spent the night and performed some necessary repairs to the vessel, which cost approximately five thousand nine hundred ($5,900.00) dollars. 97:1–98:5.

They resumed their voyage, leaving the Ponce De Leon Inlet during the afternoon of August 18, 1999, with hopes of reaching Charleston, South Carolina by the end of the day. 173:15–21; 207; 25–208:3; 209:13–18. However, after having traveled along the coast toward Charleston, they decided to enter the port of Savannah, Georgia and resume their travel during the daylight hours on the following day. 209:22–210:14.

The port of Savannah, Georgia is an international port that handles ship traffic on a regular basis, including large containerized cargo ships, Navy destroyers, frigates, and tanker traffic. 987:5–988:1. An average of six to eight ships enter or leave the port of Savannah each day. 987:5–12. All such shipping traffic must pass through the channel between the north and south jetties in order to reach the port of Savannah.

As the St. Yves approached the port of Savannah, John LaPlante, who was at the helm of the St. Yves, attempted to navigate the vessel from the Atlantic Ocean into the mouth of the Savannah River amid a significant following sea which made it difficult for him to maintain a steady course, 207:25–208:17, while the remaining two crew members sought to identify the buoys in the channel. 36:8–9; 38:7–10.

With John LaPlante remaining at the helm, the St. Yves struck the inshore (or the channel) side of the rock jetty which guards the northern flank of the channel and ran aground at an apparent speed of between eight and fourteen knots. The vessel came to a stop approximately six hundred feet from the eastern end of the north jetty, facing a roughly northwesterly direction. 178:16–179:2; 661:7–12. It impacted upon the jetty at an angle of approximately forty-five (45) degrees, 949:15–20; Pls. Ex. 3, 12; Defs. Ex. 8, 9, diagram 5, in a bow-up attitude which was described as "slightly up." 791:14–793:19; 802:13–24. This jetty was composed of large, irregularly shaped granite boulders that were piled upon each other outside of the northern and southern edges of the Savannah River channel. 1007:9–25.

As a result of the grounding, the hull of the vessel sustained severe damage, which included numerous large holes and fractures at the port bow, the starboard bow, the stem of the bow, and the starboard chine forward of the starboard stabilizer. 119:25–120:12; 890:8–12; 891:7–20; 1123:1–13; Pls. Ex. 20; Defs. Ex. 9, Photos 5, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, 43, 44, 45. Numerous photographs of the vessel show punctures, tearing, and wear around the holes, all of which indicated that the vessel was moving on the rocks that had penetrated the hull. 400:10–401:15; 890:13–891:6; Defs. Ex. 9, Photos 14, 15, 16, 27. Many of the hull fractures extended several feet aft of the apparent initial impact. 119:25–120:12; 360:1–6; Pls. Ex. 20; 400:10–402:12; 1123:1–13; Defs. Ex. 9, Photos 5, 16, 17, 18, 20, 21, 22, 23, 24, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44. The hole at the starboard chine extended along the bottom, toward the keel, well below the waterline, and directly beneath the starboard engine and its batteries. 120:4–12;

989:4–991:6. At the time of the grounding of the St. Yves, the main engines of the vessel were running, 53:10–14; 180:18–181:23; 256:24–25, one of its generators was operational, 45:2–6; 182:20–21, and both the interior and navigational lights were on. 45:16–19; 124:5–13; 257:9–16.

Following the collision with the jetty, the crew shut down the main engines by manually closing the air boxes on each engine because the shut off switches, which required the input of electrical current, were not operative. 53:10–14; 105:12–14. The house batteries, which supply power to the electrical equipment on the vessel, were located in the engine rooms. 250:22–251:1. The generator shut down spontaneously. 45:2–6.

At approximately 2:30 a.m., the United States Coast Guard received a "mayday" call from the St. Yves.[5] 188:21–23; Pls. Ex 12. During this conversation, the Coast Guard radio operator collected and documented information about the state and the location of the St. Yves, the condition of its occupants, and such other vital information as the presence of water, if any, in the vessel.[6] 186:15–21; Pls. Ex. 12. There were several entries in the SAR which indicated that the St. Yves was "taking on water." This report included information which documented the entry of water into the vessel from the bow at a rate of approximately forty (40) to fifty (50) gallons per minute. Pls. Ex. 12. The first handwritten entry in this report indicates that (a) the first "mayday" call was received at 2:33 a.m. and (b) the vessel was "taking on water." Pls. Ex. 12.

Paul E. LaPlante, while acknowledging that he had no reason to doubt the accuracy of the SAR report, denies that there was any water entering his vessel at the time of his "mayday" call, 78:20–23; 79:19–21; 100:9–15; 127:16–19, and asserts that neither he nor the other members of the crew have any idea where the Coast Guard obtained the "taking on water" information. 81:20–22; 112:20–113:11. Despite his rejection of this portion of the Coast Guard report, there is no evidence in the record which would suggest that the information had originated from any source other than the crew members of the St. Yves. 815:14–816:10.

Moreover, there are several trial witnesses, all of whom were credible on this narrow issue, including Keith Williams,[7] Dana Lutz, and Barry Boney,[8] all of whom 8; 771:16–19; 796:19–20; 797:15–16; 914:3–13; 935:16–20.

5. A "mayday" is defined as "an international radiotelephone signal used by aircraft and ships in distress." AMERICAN HERITAGE COLLEGE DICTIONARY 840 (3rd Ed.1993) It was the understanding of Paul E. LaPlante that a "mayday" call to the Coast Guard is to be used only in those instances where human lives are at stake. 117:7–11.

6. The first handwritten entry in the Coast Guard's Search and Rescue Report ("SAR") contains the following notation: "20 deg. nose up." 813:21–816:13. The tide charts for that evening indicate the tide was high at 2:30 a.m., with a height of 6.3 feet. Pls. Ex. 22. The night was dark, as the moon set at around 11:30 p.m., the wind was blowing ten (10) to fifteen (15) knots from the Southwest, and the seas were running anywhere between two (2) to five (5) feet at that location. 255:6–

7. Keith Williams of Sea Tow overheard the conversation between the Coast Guard and a crew member of the St. Yves. According to Williams, the caller aboard the distressed vessel was in a state of panic, and evidenced fear in the crew member's voice. 686:16–25.

8. Barry Boney operates a Sea Tow franchise on St. Catherine's Island, 627:11–15, and maintains a twenty four hour watch every day of the year on his radio by monitoring Channel 16, 628:22–629:8, which is a hailing and emergency frequency that is constantly monitored by the Coast Guard. 940:15–19. As a regular part of his work routine, Boney, in leaving the radio on in his house, has devel-

heard the "mayday" call and recalled hearing fear and apprehension in the voice of the caller aboard the St. Yves. In addition to their description of the fear and panic in the caller's voice during the "mayday" call, Lutz and Boney testified that the caller aboard the vessel told the Coast Guard that (1) it was "taking on water," (2) the batteries were at risk of being flooded, and (3) if help was not sent immediately, the St. Yves might lose its power and radio communications. 629:9–25; 631:14–633:19; 652:4–18; 686:16–25; 709:13–19; 794:9–11; 816:21–817:3; 937:6–20.

The Coast Guard began its rescue mission at 2:38 a.m, approximately eight minutes after its receipt of the "mayday" call, and arrived at the rock jetty at 2:43 a.m. The Coast Guard, finding a completely darkened vessel,[9] found all three members of the St. Yves crew with life jackets, packed luggage, and presumably prepared to abandon their vessel. 52:20–22; 116:15–25; 189:22–190:16. The St. Yves' emergency life raft had been removed from its storage bracket and moved to the rear cockpit ready for deployment. 52:18–22. Pls. Ex. 12. The Coast Guard, after directing the three men to abandon the vessel, refused to allow them to bring their luggage. 56:6–57:11. At 2:53 a.m., the passengers aboard the distressed vessel were transferred to the Coast Guard's boat. 973:10–17; Pls. Ex. 12.

During the aftermath of the rescue effort, the Coast Guard advised the crew members that they needed to retain the services of a private salvage contractor to handle the salvage of the vessel.[10] The Coast Guard provided them with two recommendations: Tow Boat U.S. and Sea Tow of Savannah. 59:19–60:1. Sea Tow was chosen by Paul E. LaPlante. 59:19–61:13. At Paul E. LaPlante's urging, the Coast Guard notified Sea Tow at 2:49 a.m. that its services had been requested to assist in the salvaging of the St. Yves. Pls. Ex. 12.

The nearest Sea Tow vessel, a 38′ aluminum workboat, M/V Wideload ("Wideload"), was the first vessel to arrive on the scene because it had been docked at Lazaratto Creek, about a ten (10) minute run from the north jetty. 698:24–701:1; 1018:20–1019:17. This Sea Tow vessel, with Keith Williams and Reid Lutz aboard, arrived around 3:01 a.m. and approached a completely darkened St. Yves a few minutes later. 952:22–953:8; 943:18–945:3; 1051:24–1052:14; Pls. Ex. 12. Williams looked for but could not find lights of any type aboard the vessel and concluded that there was no electricity on board when he performed his inspection. 664:18–19; 671:11–15.

Lutz brought the Wideload up to the stern of the St. Yves, and Williams jumped aboard and found no power on the boat. 664:18–19. When Williams checked the

---

oped an ability for filtering radio traffic at night from his home. 629:4–8.

On the morning of August 19, 1999, the "mayday" call from the St. Yves brought Boney out of his slumber due to the level of anxiety in the caller's voice. 629:9–25. On a scale of 1–10, with 10 being the highest level of distress, he described the level of distress in the caller's voice as a "10". 631:6–14.

9. Paul E. LaPlante testified that the lights of the St. Yves were still on when the Coast Guard arrived. 57:20–21; 66:15–19; 126:3–4

10. The Coast Guard does not perform salvage operations, and will only respond to a marine emergency if needed to save lives or if a vessel is sinking. 946:11–947:1. Because the Coast Guard does not perform salvage operations, it will (1) provide to a vessel's owner the names of salvors in that area who can provide the appropriate assistance and (2) contact those salvors on behalf of the owner. 947:2–14.

engine room, he heard running water, and felt the St. Yves shudder and move around on the rocks. 663:1–6; 734:25–735:9. He called Lutz to bring pumps and get him off the vessel. 663:23–664:19. Williams then moved to the forward V-berth and found the forward hatch full of water. 663:6–19.

Williams returned onto the cockpit deck of the St. Yves where he was standing in ankle-deep water, 664:4–8. He opened the lazarette, which is about four (4) feet deep, saw that it was full of water, and observed water running through the two transom scuppers, or drain holes, onto the cockpit deck. 664:6–8; 669:24–670:7. Lutz handed two (2) electric two-inch (2″) submersible pumps to Williams who dropped them into the lazarette, along with a three-inch (3″) gasoline-powered pump. When the St. Yves began to slide off the jetty, Lutz pulled the Wideload boat away in an effort to control the drift of the distressed vessel. 962:11–965:7.

The St. Yves continued moving and grinding on the rocks, taking on water, and shortly after slid off the rocks. 670:18–19; 796:8–10; 779:25. Sea Tow pulled the sinking vessel away from the rocks in an effort to prevent it from breaking up due to winds and the pounding of the waves on the rocks. Sea Tow attempted to delay the sinking of the St. Yves until it could be safely towed to the other side of the jetty and out of the Savannah River channel. 671:24–672:2; 964:24–965:20.

Lutz and Williams cut the hip tow, disconnected the gas pump from their vessel, and towed the St. Yves to a location behind the north jetty after it had rolled over. 670:20–671:6; 971:5–24. Sea Tow continued towing the vessel until it grounded and stopped. Thereafter, Sea Tow tied the tow line to one of its own anchors, set the anchor, and attached a white strobe light to mark the location of the wreck. 975:1–23. By towing the St. Yves around the end of the jetty as it sank, Sea Tow removed the vessel from the Savannah River channel. 847:7–848:6. After the Wideload cut its hip line and maneuvered into a stern tow configuration, it was difficult to pull this 80,000 lb. vessel full of water. As such, the Wideload had to pull violently and forcefully on the St. Yves in an effort to maneuver in the wind and waves. 964:8–966:24. The St. Yves never totally sank; it retained some buoyancy. 586:9–20; 587:8–11.

After towing the vessel away from the channel, Sea Tow arranged for the transfer of the three crew members to the Wideload. 975:24–976:5. After boarding the Wideload, Paul E. LaPlante read and signed an agreement entitled "Sea Tow Log and Job Invoice." The back of that form contained a Salvage Agreement, which was also read and signed by him. 782:21–783:25; 802:25–803:6; 804:20–21.

Thomas Eve, a marine surveyor for Zurich and Farmers Insurance, called Lutz later that day, and told him that he did not have any objections to the charges for the work performed by Sea Tow during the early morning hours of August 19, 1999. 587:24–590:22. Later that morning, he asked Sea Tow to monitor the St. Yves on a daily twenty-four hour basis. 979:3–8. When Sea Tow returned to the St. Yves, it found that the vessel had drifted during the morning. 979:9–17. Lutz and Eve negotiated a price for the use of additional anchors, ground tackle, deep water diving and for a twenty-four hour monitoring service. 979:18–980:11.[11]

On August 30, 1999, less than two (2) weeks after the accident, Paul E. LaPlante executed a "Sworn Statement in Proof of

---

11. Eve later negotiated a price with Sea Tow to reduce its monitoring service to once every three hours and to reposition the anchors if needed. 981:7–13.

*Boat Loss and Subrogation Agreement,"* in which he swore under oath that the cause of his loss was an "accident which occurred at Savannah, GA on the 19 of August, 1999 at or about the hour of 1:30 a.m. and which, to the best of my/our knowledge and belief was caused by grounding of the vessel." Defs. Ex. 4.

In the lawsuit that followed, the Plaintiffs generally contend that Sea Tow handled its rescue operations in a careless and negligent manner which resulted in, among other things, the total loss of their motor yacht. They also seek to recover for the loss in value of the personal property items that were lost by them aboard the St. Yves (i.e., $67,901). Sea Tow denies all claims of carelessness and negligence and, additionally, asserts that the Plaintiffs violated their contractual obligations to pay for the services rendered prior to and following the collision of the St. Yves with the jetty in August 1999.

Two expert witnesses, Stephen Beckley and Richard Salmons, produced credible testimony which challenged the Plaintiffs' allegations of negligent conduct by Sea Tow. Stephen Beckley, a naval engineer with a master of science degree in naval architecture, 870:1–13, opined that (1) the St. Yves was unstable as it sat on the jetty, and (2) the water that was flooding into the vessel would have shifted aft, lifted the bow off the jetty, and caused the distressed vessel to slip into the water. 874:22–875:1.

Richard Salmons, the owner of Salmons Dredging Company, indicated that he had performed many salvage operations on other jetties in the Charleston, South Carolina area, which are similar to the Savannah River jetty. 834:6–837:23. He told of his experience with three vessels that had run aground upon the Charleston jetty. 838:25–840:3. Of the two (2) vessels that sank after grounding on the Charleston jetty, one of the boats actually broke up as a result of pounding on the rocks, while the other ship slid from the rocks and sank. 838:25–840:3; 842:14–22.

Here, the Plaintiffs fault Sea Tow for, among other things, traveling directly to the St. Yves without first consulting with Paul E. LaPlante to obtain his input and observations. However, Richard Salmons testified that, in his judgment, Sea Tow's handling of the distressed St. Yves was appropriate under the circumstances. The Court agrees with his assessment of Sea Tow's conduct. Sea Tow acted properly in approaching the St. Yves first and boarding the vessel to perform their survey before discussing the situation with the crew members. Time was of the essence, in that Sea Tow had been informed that the St. Yves was in an extremely perilous condition.

The Plaintiffs also contend that the St. Yves was grounded so high upon the jetty that it could not have taken on any water. They also submit that Sea Tow pulled the vessel from its perch atop the rocks into the Savannah River in a violent and negligent manner. David Scott of Southeastern Marine Surveying Co., Inc. performed a bollard pull test on the Wideload in order to determine the maximum amount of force that this rescue vessel was capable of pulling. His test showed that the maximum amount of force that the Wideload could generate was 3,200 lbs, which was apparently substantially less than the force that would have been required to pull the St. Yves off the jetty. 974:13–23. For this reason, the Court concludes that the Wideload was incapable of producing sufficient force to pull the St. Yves off the jetty and did not do so on the evening in question.

### CONCLUSIONS OF LAW

The Court possesses jurisdiction over the parties and the subject matter of this

litigation pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

■ As a rule, claims arising out of salvage operations are within the admiralty jurisdiction of the federal courts. *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 566 (5th Cir.1981). In admiralty, federal maritime law governs the rights and obligations of the parties. 28 U.S.C. § 1333. If there is no admiralty law on point, the court must look to state law, either statutory or decisional, to supply the rule of decision. *Byrd v. Byrd,* 657 F.2d 615, 617 (4th Cir.1981).

After the Coast Guard had come to the aid of the St. Yves crew members, Paul E. LaPlante signed a salvage contract which read, in pertinent part, as follows:

> The CUSTOMER agrees to payment in full of all charges and in the event of any collection procedure, including arbitration, made necessary by reason of the customer's failure to pay, agrees to pay all reasonable charges for collection including costs, attorney's fees, and interest. Charges incurred shall constitute a lien upon the vessel and all cargo, goods, or property on board the vessel, and all freight and/or charthire at risk in respect of the cargo. THE SALVOR has authority to retain all possession of the vessel, its fuel, provisions, cargo and personal effects on board until full payment is made. THE SALVOR has the authority to take all steps he deems reasonable or necessary to secure the vessel, its cargo and its contents. Customer agrees to defend and indemnify THE SALVOR, its agents, servants or affiliates for any and all claims arising out of any work rendered, for all acts of negligence except THE SALVORS own gross negligence, and customer waives any claim for property damage to a towed, slaved or otherwise assisted vessel. . . . The customer agrees to hold harmless, defend and indemnify Sea Tow, Sea Tow Services International Inc., its agents, servants, or affiliates for any and all claims arising out of any work rendered. I HAVE READ OR HAD READ TO ME FULLY, THE ABOVE. I HEREBY UNDERSTAND AND AGREE TO ALL AND SIGN FREELY AND WITHOUT DURESS.

Pls. Exhibit 13.

In signing this document, he agreed, among other things, to indemnify Sea Tow from liability for any negligence, other than gross negligence in its salvage efforts. In this contract, he waived any claim for property damage to the vessel. The contract also gave Sea Tow the right to retain possession of the vessel and personal property held by Sea Tow until the salvage charges were paid.[12] As the Plaintiffs have failed to demonstrate gross negligence in the services rendered by Sea Tow, the provisions of the contract are upheld.

The Court also concludes that the terms and conditions within the oral contract between Thomas Eve, acting on behalf of the Plaintiffs, and Sea Tow is valid and enforceable. Furthermore, the Plaintiffs are

---

**12.** Sea Tow has retained possession of a 13′ Boston Whaler dinghy, an anchor, and a life raft salvaged from the ocean after the St. Yves sank. 992:2–8. Sea Tow retains possession of those items, claiming a lien to secure payment of the Plaintiffs' unpaid bills. Sea Tow submitted a bill for its services to Eve in the sum of $29,134.44. Pls. Ex. 10, 11. Eve recommended to the Plaintiffs' insurance carrier that the bill be paid, other than the initial response fees, which amounted to roughly $1,200. 587:24–590:22. No portion of the bill has been paid. 991:7:992:1. Sea Tow is prepared to return the items of personal property when the Plaintiffs pay the bill. 993:25–994:1.

required to compensate Sea Tow for its salvage efforts prior to Eve's involvement.

As a general proposition, a salvor is not liable in negligence for damages to a vessel where the claimed damage or injury to the vessel is the same as the injury to which the vessel was exposed before the salvage efforts were undertaken. A salvor is liable in simple negligence for injury to the salved ship only if the character of the injury is distinguishable from the type of damage that necessitated calling a salvor. *The Noah's Ark v. Bentley & Felton Corp.*, 292 F.2d 437, 440–41 (5th Cir.1961).

Here, Sea Tow was called upon to attend to the vessel's imminent peril of sinking in or near the Savannah River shipping channel. The vessel was taking on water and was sinking. As the St. Yves sat upon the jetty, it was becoming more unstable, and it sank after sliding off the jetty. The holes in the vessel, the flooding of seawater through those holes and the forces of the waves and tide caused the vessel to sink. With the extent of damage to this vessel, there was nothing Sea Tow could do to prevent its sinking in the limited time the vessel remained on the rocks.

In *DFDS Seacruises v. United States*, 676 F.Supp. 1193, 1201 (S.D.Fla.1987), a federal district court held that in applying the gross negligence standard to salvage operations:

[t]he Court should not second-guess difficult decisions made by rescue personnel in the midst of an emergency, but determine what a reasonable [salvor] should have done when confronted with the scene of the [emergency]. 'The first [public policy rationale] may be directed to the inevitable consequence on the morale and effectiveness of the [salvor] if the conduct of [the salvors] in the field of rescue operations under the indescribable strains, hazards, and crises

which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday-morning judicial quarterbacks functioning in an atmosphere of serenity and deliberation far from the maddening crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers.... If men are to be brought to an abrupt halt in the midst of crises-to think first that if they err in their performance they may expose their [employers] to financial loss and themselves to disciplinary measures or loss of existing status, and then to pause and deliberate and weigh the chances of success or failure in alternate [salvage] procedures, the delay may often prove fatal to the distressed who urgently require their immediate aid.'

*DFDS Seacruises Ltd., supra,* at 1201–02 (quotation omitted). Having found that the St. Yves was doomed to be a total loss once it struck the jetty, the Court cannot conclude that Sea Tow was at fault or that Sea Tow caused it to sink. Paul E. LaPlante testified that the loss of his vessel was the result of the "accident which occurred at Savannah, GA on the 19 of August, 1999 at or about the hour of 1:30 a.m. and which, to the best of my/our knowledge and belief was caused by *grounding of the vessel.*" Defs. Ex. 4 (emphasis added). As the vessel sat upon the rocks, it was unstable with water entering the hull, flooding the lazarette. Sea Tow immediately placed pumps into the lazarette, but the vessel was losing buoyancy and waves were breaking on the deck and water was coming through the scuppers. When it became apparent the vessel was off the rocks, Sea Tow pulled it away from the jetty and placed an additional pump aboard. The size and number of holes in the vessel allowed a tremendous volume of water to enter the hull, and it sank, despite the efforts of Sea Tow to save it. The Court thus concludes that Sea Tow

was not negligent or grossly negligent in its actions on the evening in question, and finds that the Plaintiffs' claims against it are without merit.

The Court now turns to Sea Tow's counterclaim. According to maritime law, there are two types of salvage operations; namely, contractual salvage and voluntary salvage (also known as "pure salvage"). A contractual salvage occurs where there is (1) a contract to pay, (2) a given sum for the services or a binding agreement to pay in all events, and (3) whether the work is successful or unsuccessful. *Bay & Delta Tractor Tug Co. v. The Barge Pacific Trader*, No. C–95–0107–CAL, 1997 WL 797935, at *1, 1997 U.S. Dist. LEXIS 21510, at *4 (N.D.Cal. Dec. 16, 1997). A binding contract can be made orally and an exact dollar amount is not necessary to form a binding agreement. *Id.*

On the other hand, a voluntary salvage occurs under the following conditions: (1) "[t]here must be a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance"; (2) "[t]he salvor's act must be voluntary—that is, he must be under no official or legal duty to render the assistance; and (3) '[t]he act must be successful in saving, or in helping to save, at least a part of the property at risk.'" *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1104 (9th Cir.1985). A marine peril exists "when a vessel is exposed to any actual or apprehended danger which might result in her destruction." *Faneuil Advisors, Inc. v. O/S Sea Hawk*, 50 F.3d 88, 92 (1st Cir. 1995). In determining whether the salvor's services were voluntary, "the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful

in the enterprise, will operate as a bar to a meritorious claim for salvage." *Id.* quoting *The Camanche*, 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869). "Success" in salvage law is preservation of the property for the benefit of the owner. *Evanow v. M/V Neptune*, 163 F.3d 1108, 1115 (9th Cir.1998) (internal quotation omitted). Furthermore, "[t]he fact that a ship owner requests a salvage service and that the salvors in response furnish it, *standing alone*, does not create an implied contract so as to defeat a salvage claim." *Id.*, quoting *Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir.1968) (emphasis in original).

The Court finds that Paul E. LaPlante's engagement of Sea Tow was for a contractual salvage service. The Plaintiffs, through the Coast Guard, called Sea Tow and requested salvage assistance for their vessel. Sea Tow accepted their offer by providing the assistance requested and, thus, a binding salvage contract was formed. A salvage contract is deemed to be payable only upon success of the mission unless the terms of the agreement call for payment in any event. *ATCO, Inc. v. Disch Construction*, No. 89–Civ.–7809, 1992 WL 230482, at *3, 1992 U.S. Dist. LEXIS 12950, at *17 (S.D.N.Y. Aug. 28, 1992). Under the salvage agreement that was signed by Paul E. LaPlante, he agreed "to payment in full of all charges." This language calls for payment in any event. The contract disclaims liability for damage to the vessel and was signed by Paul E. LaPlante after the St. Yves sank. When the agreement was signed, he knew that his vessel had been damaged. According to the terms of this enforceable contract and the applicable case law, Sea Tow is entitled to a payment of $1,200 for this portion of its services.

The Court also finds that the contract entered into by Thomas Eve (on behalf of

the Plaintiffs) and Sea Tow was an enforceable contractual salvage agreement. The parties negotiated a price for Sea Tow's services. The vessel was successfully towed out of the Savannah River channel after sinking, was anchored outside the channel and marked with a lighted beacon. Sea Tow performed its obligations under the contract when it maintained an on-site around-the-clock (and subsequently modified) as requested by the Plaintiffs. Thomas Eve testified that he retained Sea Tow to mark and monitor the vessel after it sank, that Sea Tow performed exactly as he requested, and that he advised the Plaintiffs' insurer to pay Sea Tow's bill for all services rendered after he became involved on August 19, 1999. Nothing has been paid as of this date. Thus, Sea Tow is entitled to $27,931.44 for this portion of its services.

The Court also finds the Plaintiffs and their crew to have been totally negligent in causing the sinking of the St. Yves. A judgment of no cause of action shall be entered in favor of the Defendants upon all claims asserted by the Plaintiffs.

■ In summary, the Court concludes that Sea Tow is entitled to recover a total sum of $29,131.44 for its salvage services. In admiralty, pre-judgment interest is generally awarded, unless compelling reasons make such an award unjust. *City of Milwaukee v. Cement Division, National Gypsum Co.,* 515 U.S. 189, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995). Judgment shall be entered in favor of Sea Tow in the amount of $29,131.44, with pre-judgment interest from October 20, 1999, the date that Eve forwarded Sea Tow's bill to Paul E. LaPlante's insurance carrier for payment until Sea Tow receives payment for its services.

Sea Tow shall return any items it is currently holding from the wreckage of the St. Yves to the Plaintiffs upon satisfaction of the judgment by the Plaintiffs.

Finally, under the terms of his written contract, the Plaintiffs agreed to pay costs and attorney's fees in any collection proceeding. In that the counterclaim in this litigation can be aptly described as a "collection proceeding," costs shall be taxed against the Plaintiffs, and Sea Tow shall be entitled to a reasonable attorney's fee which will be determined in accordance with the provisions of Rule 54 of the Federal Rules of Civil Procedure and Local Civil Rule 54.02 DSC.

This Court shall retain jurisdiction to determine an appropriate award of attorney's fees and costs to Sea Tow. An itemization of the proposed attorney fees and costs shall be submitted by Sea Tow to the Court, with a copy to the Plaintiffs, not later than thirty (30) days from the entry date of this Order.

IT IS SO ORDERED.